UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN - SOUTHERN DIVISION

JANE DOE BR,

       Plaintiff,

v.

MICHIGAN STATE UNIVERSITY; THE BOARD OF
TRUSTEES OF MICHIGAN STATE UNIVERSITY;
LAWRENCE GERARD NASSAR (individual
capacity); KATHIE KLAGES (individual capacity);
WILLIAM D. STRAMPEL (individual capacity);
JEFFREY R. KOVAN (individual and official
capacity); GARY STOLLAK (individual capacity);
DOUGLAS DIETZEL (individual and official
capacity); BROOKE LEMMEN, D.O., (individual
capacity);    DESTINY TEACHNOR-HAUK
(individual capacity); and KRISTINE MOORE
(individual capacity);

       Defendants.

Case No.    1:19-cv-807

Hon.

---

DONNA M. MACKENZIE (P62979)
OLSMAN, MACKENZIE, PEACOCK &
WALLACE, P.C.
Attorneys for Plaintiffs
2684 West Eleven Mile Rd.
Berkley, MI 48072
(248) 591-2300 / 248-591-2304 [fax]
dmackenzie@olsmanlaw.com
ethomas@olsmanlaw.com

---

A civil action between these parties or other parties arising out of the transaction or occurrence alleged in
this Complaint has been previously filed in this Court, where it was assigned docket number 1:17-cv-29 and
was assigned to Judge Quist. That action remains pending.

**COMPLAINT AND JURY DEMAND**

NOW COME Plaintiffs, by and through their attorneys, OLSMAN MACKENZIE

PEACOCK & WALLACE, P.C., and for their Complaint against the above-named Defendants,

Michigan State University (hereinafter *"Defendant MSU"*), the Board of Trustees of Michigan

State University, John Geddert, Kathie Klages, William D. Strampel, Jeffrey R. Kovan, D.O., Douglas Dietzel, D.O., Brooke Lemmen, D.O. Gary E. Stollak, Kristine Moore, Destiny Teachnor-Hauk (hereinafter with Defendant MSU collectively referred to as *"MSU Defendants"*), Lawrence Gerard Nassar (hereinafter *"Defendant Nassar"*), states as follows:

## INTRODUCTORY STATEMENTS

1.      This is a civil action for declaratory, injunctive, equitable, and monetary relief for injuries sustained by Plaintiffs as a result of acts and omissions of Defendant MSU, Defendant The Board of Trustees of Michigan State University, Defendant Nassar, and their respective employees, agents, and/or representatives, relating to sexual assault, battery, molestation, harassment, and discrimination by Defendant Nassar against Plaintiffs.

2.      At all times pertinent hereto, Defendant Nassar was retained by Defendant MSU to provide medical care, treatment, and advice to Michigan State University athletes and members of the general public. Defendant Nassar regularly provided such medical care, treatment, and advice at Defendant MSU's training department, MSU Sports Medicine Clinic.

3.      Defendant Nassar came highly recommended to Plaintiffs as a renowned orthopedic sports medicine physician, purportedly well-respected in the sports medicine community, specifically in the gymnastics community as the Team Physician for the United States Gymnastics team.

4.      Upon information and belief, Defendant Nassar used his position of trust and confidence to regularly and systematically sexually assault, batter, molest, and harass female patients over the entire course of his career in his capacity as an employee, agent, and/or representative of Defendants MSU, for his own personal self-gratification.

5.     Despite being informed of Defendant Nassar's sexual assault, battery, molestation, and harassment, MSU failed to take appropriate action to prevent Defendant Nassar from sexually molesting, abusing, and harassing his patients over the course of his career in his capacity as an employee, agent, and/or representative of Defendant MSU.

## JURISDICTION

6.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

7.     This action is brought pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. 1681 *et seq.*, as more fully set forth herein.

8.     This action also seeks to redress the deprivation of Plaintiffs' rights secured by the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

9.     This Court has subject matter jurisdiction over this action pursuant to Title 28 U.S.C. § 1331 in that the controversy arises under the Constitution, laws, and treaties of the United States.

10.     Subject matter jurisdiction is also founded upon 28 U.S.C. § 1343 which grants district courts original jurisdiction over any civil action authorized by law to be commenced by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; or any action to recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

11.     Plaintiffs further invoke the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a) to hear and decide claims arising under state law that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

12.     Plaintiffs' claims are cognizable under the United States Constitution, 42 U.S.C. § 1983, 20 U.S.C. § 1681, *et seq.,* and under Michigan law.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims arose in this judicial district, in Ingham County, Michigan.

14.     Plaintiffs have filed the appropriate Notice of Intent to File Claim with the Michigan Court of Claims pursuant to MCL 600.6431

## PARTIES

15.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

16.     Plaintiff JANE DOE BR is a resident of the State of Michigan. She was a minor during the time she was sexually assaulted abused and molested by Defendant Nassar.

17.     Defendant Nassar was a Doctor of Osteopathic Medicine and is a resident of Ingham County, Michigan.

18.     Defendant Michigan State University is and was, at all times pertinent hereto, a state-owned and operated public university and institution of higher education organized and existing under laws of the State of Michigan.

19.     Michigan State University receives federal financial assistance and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 *et*

*seq.*

20.     Defendant The Board of Trustees of Michigan State University is the governing body for Michigan State University.

21.     Lou Anna K. Simon is the immediate past President of Defendant MSU, serving from approximately January 2005 - 2018. Prior to her appointment as president, Simon held several administrative roles including assistant provost for general academic administration, associate provost, and provost and vice president for academic affairs during her career with MSU.

22.     John Engler was the Interim President of Defendant MSU, appointed on or about February 5, 2018 until he resigned on or about January 17, 2019.

23.     Dr. Satish Udpa was the immediate past Interim President of Defendant MSU appointed after John Engler resigned until the current President was appointed.

24.     M. Peter McPherson is a past President of Defendant MSU and served as President from approximately 1993 - 2004.

25.     Andrea Amalfitano, is the acting Interim Dean of the College of Osteopathic Medicine at MSU. He was appointed in approximately February 2018

26.     Defendant William D. Strampel, D.O. (hereinafter *"Defendant Strampel"*) was the Dean of the College of Osteopathic Medicine at Defendant MSU, serving as Dean from approximately 2002-2017.

27.     Defendant Jeffrey R. Kovan, D.O. (hereinafter *"Defendant Kovan"*), is or was the Director of Division of Sports Medicine at Defendant MSU.

28.     Defendant Douglas Dietzel, D.O. (hereinafter *"Defendant Dietzel"*), is the Clinical Director of MSU Sports Medicine and Team Orthopedic Surgeon for MSU

Department of Intercollegiate Athletics serving as Clinical Director of MSU Sports Medicine since approximately 2004.

29. Defendant Brooke Lemmen, D.O. (hereinafter *"Defendant Lemmen"*), is or was a practicing physician with MSU Sports Medicine from approximately 2010 to 2017.

30. Defendant Kathie Klages (hereinafter *"Defendant Klages"*) was the head coach of the Michigan State University Gymnastics Program until her suspension and resignation in early 2017; she also conducted gymnastics classes and programs for children and young adults not on the varsity gymnastics team.

31. Defendant Destiny Teachnor-Hauk (hereinafter *"Defendant Teachnor-Hauk"*) is or was an athletic trainer for Defendant MSU for various sports including, but not limited to, softball, track and field, gymnastics, rowing, and volleyball.

32. Defendant Teachnor-Hauk regularly referred MSU student athletes to Defendant Nassar for medical treatment.

33. Defendant Gary E. Stollak (hereinafter *"Defendant Stollak"*) was a professor in the clinical program within the Michigan State University Department of Psychology.

34. Defendant Kristine M. Moore (hereinafter *"Defendant Moore"*) served as the Assistant Director for Institutional Equity Office for Inclusion and Intercultural Initiatives in 2014. Following the incident that is the subject of this civil action, Defendant Moore began serving as, and remains at this time, Assistant General Counsel at Michigan State University.

35. At all relevant times, Nassar maintained an office at MSU in East Lansing, Michigan.

36. At all relevant times, the MSU Defendants and Defendant Nassar were acting under color of law, specifically under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan or MSU.

37. Defendant Nassar graduated from Michigan State University with a Doctor of Osteopathic Medicine degree in approximately 1993.

38. At all relevant times, Nassar was acting in the scope of his employment or agency with MSU.

## GENERAL ALLEGATIONS

39. Plaintiffs incorporates by reference the allegations contained in the previous paragraphs.

40. At all times pertinent hereto, Defendant Nassar maintained an office at Defendant MSU in East Lansing, Michigan.

41. At all times pertinent hereto, including the years 1996 to 2016, Defendant Nassar was an employee, representative, and/or agent of Defendant MSU acting under their control and supervision.

42. At all times pertinent hereto, including the years 1996 to 2016, Defendant Nassar was acting in the scope of his employment or agency with Defendant MSU.

43. At all times pertinent hereto, the MSU Defendants and Defendant Nassar were acting under color of law, including acting under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendant MSU.

44. Defendant Nassar graduated with a Doctor of Osteopathic Medicine degree from Defendant MSU in approximately 1993.

45. Defendant Nassar was employed by, and/or an agent of, Defendant MSU from

approximately 1996 to 2016, serving in various positions, including, but not limited to: (a) Associate Professor of Defendant MSU's Division of Sports Medicine, Department of Radiology, College of Osteopathic Medicine; (b) Team Physician of Defendant MSU's Men's and Women's Gymnastics Teams; (c) Team Physician of Defendant MSU's Men's and Women's Track and Field Teams; (d) Team Physician of Defendant MSU's Men's and Women's Crew Teams; (e) Team Physician of Defendant MSU's Intercollegiate Athletics; (f) Medical Consultant with Defendant MSU's Wharton Center for the Performing Arts; and (g) Advisor for Student Osteopathic Association of Sports Medicine.

46.     As part of Defendant Nassar's employment and contractual duties with MSU, Defendant Nassar was responsible for spending between 50 to 70% of his time engaged in "Outreach" and/or "Public Services."

47.     A part of Defendant Nassar's outreach included providing medical treatment to athletes affiliated with Defendants USAG and Twistars as well as other organizations such as Holt High School.

48.     Based on MSU's decision to compensate Nassar for his work with USAG and Twistars, Nassar was acting in the scope of his employment with MSU while he was working at USAG and Twistars and also while he was working with athletes from those institutions.

49.     As a physician of osteopathic medicine, Defendant Nassar's medical care and treatment should have consisted largely of osteopathic adjustments and kinesiology treatment to patients, including students and student athletes of Defendant MSU.

50.     Defendant Nassar is not and has never been a medical doctor of obstetrics or gynecology.

-8-

51.     Defendant Nassar was a renowned orthopedic sports medicine physician, well respected in the gymnastics community and the team doctor of the United States Gymnastics team.

52.     Defendant Nassar was promoted by MSU as the USOC and USAG team doctor and received patients because of his status as team doctor.

53.     From in or around 1996 until September 2016, Nassar was a full-time employee of MSU, and a physician in its Sports Medicine Department. During this period, his written and contractually mandated job duties involved a vast allocation of his time (approximately 70%) being spent conducting what is described by MSU as "outreach/public services." One of the organizations that he routinely provided this outreach to was Twistars where he worked on a weekly basis along with working at secondary sports clubs and competitions in and around the state of Michigan.

54.     Nassar's employment contract with MSU specifically provided that he would serve as USAG/USOC's team physician.

55.     As part of Defendant Nassar's employment, MSU explicitly allowed and encouraged Defendant Nassar to travel across the country with USAG, USOC, and travel to Texas to perform work for Karolyi Ranch and in Michigan at Twistars and other gymnastics clubs.

56.     Plaintiffs are informed and believe, and on that basis allege that Defendants, at all times relevant to Plaintiffs' abuse, knew that Defendant Nassar was performing purported medical treatments on minor children including the Plaintiffs, knew that Defendant Nassar had complaints pertaining to these purported medical treatments (which were disguised, sexually abusive acts), but nonetheless allowed Defendant Nassar to

continue working for Defendant MSU, without any prior warning, protection, or remedial steps taken to limit his access to minor children.

57.    For over 20 years, Nassar had unrestricted and unmonitored access to young female athletes through the Sports Medicine Clinic at MSU.

58.    While employed by MSU, Nassar practiced medicine at MSU's Sports Medicine Clinic, which is located on MSU's East Lansing, Michigan campus.

59.    While employed by Defendant MSU, Defendant Nassar sexually assaulted, abused, and molested numerous female patients by engaging in nonconsensual sexual assault, battery, molestation, and harassment, including, but not limited to, digital vaginal and anal penetration without the use of gloves or lubricant.

60.    The use of gloves when exposed to potentially infectious material, including vaginal secretion, is mandated by the Michigan's Administrative Code R.325.70001 et seq.

61.    As early as 1997 and/or 1998, employees, representatives, and agents of Defendant MSU were made aware of Defendant Nassar's conduct, yet failed to appropriately respond to allegations, resulting in the sexual assault, battery, molestation, and harassment of Plaintiffs and other female patients through approximately 2016.

62.    Upon information and belief, Defendant MSU and Kathie Klages were expressly notified by a minor female athlete, Larissa Boyce, in 1997 and/or 1998, while under the instruction of Kathie Klages and MSU Youth Gymnastics, that Defendant Nassar sexual assaulted, battered, molested, and harassed Larissa Boyce on multiple occasions.[1]

---

1 September 5, 2019 US Department of Education Office for Civil Rights OCR Docket 15-15-6901 Investigation Report (DOE Report), p. 8-9.

63.     Upon information and belief, after receiving Larissa Boyce's complaint, Kathie Klages told Larissa Boyce that she had known Defendant Nassar for years and could not imagine him doing anything inappropriate.   Kathie Klages then called some of Larissa Boyce's teammates into her office and asked each one if they had similar complaints.   One of the teammates stated that Defendant Nassar touched her inappropriately.   Kathie Klages cleared the room and held up a piece of paper and said to Larissa Boyce "Well, I could file this but there's going to be very serious consequences for you and Nassar" and convinced Larissa Boyce not to file a formal complaint.[2]

64.     At Larissa Boyce's next appointment with Defendant Nassar, he confronted her about the concerns she discussed with Kathie Klages.[3]

65.     Despite her complaints to Defendant MSU employees, agents, and/or representatives, including Kathie Klages, Larissa Boyce's concerns and allegations went unaddressed in violation of reporting policies and procedures and Title IX and in a manner that was reckless, deliberately indifferent, and grossly negligent.

66.     Kathie Klages later misrepresented to investigators for the Michigan Attorney General's office that she did not recall receiving any reports of Nassar's abuse prior to 2016.   On August 23, 2018, Kathie Klages was indicted on two counts, one felony and one misdemeanor, for lying in connection with her statements asserting a lack prior knowledge of reports of Defendant Nassar's abuse.[4]

67.     In or around 1999 the MSU Defendants were also put on notice of Defendant Nassar's conduct by a MSU student and track and cross-country athlete, Christie

---

2  Id.
3  Id.
4  Ropes & Gray LLP Report at p. 49-50.

Achenbach, after she complained to MSU employees, including trainers and her head coach, Kelli Bert, that Defendant Nassar touched her vaginal area although she was seeking treatment for an injured hamstring.

68.    Despite her complaints to Defendant MSU's employees, agents, and/or representatives, including trainers and head coaches, Christie Achenbach's concerns and allegations went unaddressed in violation of reporting policies and procedures and Title IX and in a manner that was reckless, deliberately indifferent, and grossly negligent.

69.    Upon information and belief, Defendant MSU was notified in 2000 that Defendant Nassar committed acts of sexual assault, battery, molestation, and harassment when a student athlete, Tiffany Thomas Lopez, reported to MSU employees, agents, and/or representatives, including the highest-ranking employees within MSU's Training Staff, that Defendant Nassar touched her vaginal area on multiple occasions and inserted his ungloved hand into her vagina, although she was seeking treatment for back pain.

70.    Upon information and belief, an employee, agent, and/or representative of Defendant MSU, who was one of three individuals that supervised the training department, told Tiffany Thomas Lopez that what happened to her was not sexual abuse, that Defendant Nassar was a world-renowned doctor, that she was not to discuss what happened, and that she was to continue seeing Defendant Nassar for purported treatment.

71.    One of the trainers that Ms. Lopez reported to was Lianna Hadden, who is still presently employed by MSU as an athletic trainer with the volleyball team.

72.    After reporting the assault to Ms. Hadden, Ms. Lopez also reported the assault to Destiny Teachnor-Hauk.

73.    Ms. Lopez told Teachnor-Hauk that she was "extremely uncomfortable," but

-12-

Teachnor-Hauk told Ms. Lopez that Nassar was engaged in actual medical treatment.

74.    Teachnor-Hauk further dissuaded Ms. Lopez from reporting Nassar's conduct further by telling Ms. Lopez that if Lopez pursued the matter further that it would cast a burden over her family and cause Ms. Lopez a lot of heartache and trauma.

75.    Teachnor-Hauk also defended Nassar by stating to Ms. Lopez by asking why she would want to drag Nassar through an allegation of sexual assault.

76.    Despite her complaints to Defendant MSU employees, agents, and/or representatives, including the highest-ranking employees within MSU's Training Staff, Tiffany Thomas Lopez's concerns and allegations went unaddressed in violation of reporting policies and procedures and Title IX and in a manner that was reckless, deliberately indifferent, and grossly negligent.

77.    A MSU student athlete, Jennifer Rood Bedford, who was on the 1998-1999 volleyball team reported that her teammates commonly referred to Defendant Nassar as "happy fingers" and frequently talked about his "crotch massages" for his unconventional methods of treating back and hip pain.   These comments were made in the presence of MSU University athletic trainers who were employees of MSU.   After Jennifer Rood Bedford was abused, she reported it to an MSU athletic trainer Lianna Hadden and said she wanted to make a report.   After discussing the process of filing a complaint with one of the trainers she didn't file a complaint because she was told she couldn't do so without accusing Defendant Nassar of criminal wrongdoing. [5]

78.    After reporting the assault to Ms. Hadden, the student athlete also reported the assault to Defendant Destiny Teachnor-Hauk.

---

5  Ropes & Gray LLP Report at p. 50-51; DOE Report p. 7.

79.     The student athlete told Defendant Teachnor-Hauk that she was "extremely uncomfortable," but Teachnor-Hauk told her that Nassar was engaged in actual medical treatment.

80.     Teachnor-Hauk further dissuaded the student from reporting Nassar's conduct by telling her that if she pursued the matter further that it would cast a burden over her family and cause the student a lot of heartache and trauma.

81.     Teachnor-Hauk also defended Nassar and discouraged the student by asking why she would want to drag Nassar through an allegation of sexual assault.

82.     Despite her complaints to Defendant MSU employees, agents, and/or representatives, including the highest-ranking employees within MSU's Training Staff, the student athlete's concerns and allegations went unaddressed in violation of reporting policies and procedures and Title IX and in a manner that was reckless, deliberately indifferent, and grossly negligent.

83.     Approximately in 1999/2000, an MSU track and cross-country athlete reported to her coach that Defendant Nassar penetrated her.   The coach responded that Nassar was "an Olympic doctor and he should know what he is doing."[6]     Despite this complaint to Defendant MSU's employees, agents, and/or representatives, including trainers and head coaches, the student's concerns and allegations went unaddressed in violation of reporting policies and procedures and Title IX and in a manner that was reckless, deliberately indifferent, and grossly negligent.

84.     Approximately, in 1999/2000 an MSU softball athlete reported to an MSU athletic trainer that Defendant Nassar had inserted his fingers into her during treatment.

6  Ropes & Gray LLP Report at p. 50.

The MSU trainer, who was one of three individuals that supervised the training department, responded that Defendant Nassar was a world-renowned doctor performing legitimate treatment.   The athlete also spoke to supervising trainers in the MSU athletic department, who had a similar response about Defendant Nassar's treatment.[7]   Despite this complaint to Defendant MSU's employees, agents, and/or representatives, including trainers and head coaches, the student's concerns and allegations went unaddressed in violation of reporting policies and procedures and Title IX and in a manner that was reckless, deliberately indifferent, and grossly negligent.

85.   Upon information and belief, Defendant MSU was notified in approximately 2004 that Defendant Nassar had been sexually abusing for many years Kyle Stephens–then 11 or 12 years old–who was the daughter of family friends of Defendant Nassar.   Kyle Stephens reported that Defendant Nassar had sexually abused, molested, assaulted and harassed her for many years in his home.   Defendant Nassar's conduct was reported to Defendant MSU's employees, including Defendant Gary E. Stollak who was an MSU clinical psychologist at the time.[8]

86.   Defendant Stollak did not report the abuse to law enforcement or to child protective services and as a result of his failure to report the abuse he was forced to surrender his psychology license.

87.   Instead of reporting the abuse, Defendant Stollak suggested that Ms. Stephens and her parents meet with Nassar.

---

7  Ropes & Gray LLP Report at p. 50; DOE Report p. 7.
8  Ropes & Gray LLP Report at p. 51.

88.     Ms. Stephens refused to attend the meeting, but her parents met with Defendant Stollak and Defendant Nassar.

89.     In 2004, a 17-year-old woman, Brianne Randall-Gay, sought treatment for back pain and reported Defendant Nassar's conduct to her parents and to the Meridian Township Police Department in Meridian Township, Michigan.  Brianne Randall-Gay detailed how Defendant Nassar attempted to penetrate her, had rubbed her breasts and had neither explained the invasive procedure nor worn gloves.[9]

90.     The employees, agents, and/or representatives of Defendant MSU, including MSU trainers, coaches, athlete staff, Katie Klages, Lianna Hadden, and Gary Stollak, had a duty to report each and every one of these allegations of Defendant Nassar's inappropriate sexual conduct.

91.     On December 21, 2018 the Michigan State Attorney General's Office released the report of its Independent Special Counsel's investigation into Defendant Nassar's sexual conduct.  The Special Counsel stated in its report that the investigation revealed MSU created a "culture of indifference toward the health and safety of MSU students and faculty."[10]  The Report went on to state that the MSU employees who received reports of Nassar's sexual assault or improper medical treatment downplayed the seriousness of the incident or affirmatively discouraged the survivor from proceeding with their allegation.[11] The report concluded:

> When faced with accusations of digital penetration during routine medical treatments—serious allegations that amount to criminal wrongdoing—the MSU employees discounted the young woman's story and deferred to Nassar, the

---

9  Ropes & Gray LLP Report at p. 52.
10  Michigan Attorney General's Report at p. 10.
11  Id.

world-renowned sports medicine doctor.

92. Because MSU took no action to investigate the 1997/1998, 1999, 2000, 2001/2002, and 2004 complaints and took no corrective action, from 1997 and/or 1998 to 2016, under the guise of treatment, several individuals, including Plaintiffs, were sexually assaulted, abused, molested, and harassed by Defendant Nassar by vaginal digital penetration, without the use of gloves or lubricant and by touching and groping their breasts.

93. Defendant MSU's deliberate indifference before, during, and after the sexual assault, battery, molestation, and harassment of Plaintiffs was in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.,* 42 U.S.C. § 1983, as well as other federal and state laws.

94. Defendant MSU's failure to comply with Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, 42 U.S.C. 1983, and other federal and state laws, as describe herein this Complaint, contributed to the creation of a sexually hostile environment on MSU's campus between 1997 and 2018.

95. In 2014, following receipt of an unrelated complaint regarding a sexual assault on Defendant MSU's campus, between 2014 and 2015, the U.S. Department of Education's Office of Civil Rights (hereinafter "OCR") conducted an investigation regarding the complainant's allegations, another complaint regarding sexual assault and retaliation from 2011, and Defendant MSU's response to said complaints, and their general policies, practices, and customs pertaining to their responsibilities under Title IX.

96. The OCR concluded their investigation in 2015 and presented Defendant MSU with a twenty-one-page agreement containing measures and requirements to resolve

the 2011 and 2014 complaints and to bring Defendant MSU in compliance with Title IX.

97.    The report confirmed that the *"OCR determined that the University's Title IX grievance procedures, in place during the time period covered by OCR's investigation, failed to comply with the requirements of Title IX."*

98.    The report further confirmed that the *"OCR determined that a sexually hostile environment existed for and affected numerous students and staff on campus at the University during the time period covered by OCR's investigation; and that the University's failure to address complaints of sexual harassment, including sexual violence, in a prompt and equitable manner caused and may have contributed to a continuation of this sexually hostile environment."*

99.    While the OCR was conducting their investigation, additional complaints regarding Defendant Nassar's conduct surfaced in 2014.

100.    In 2014 Amanda Thomashow (Thomashow) reported she had an appointment with Nassar to address hip pain and was sexually abused and molested by Nassar when he cupped her buttocks, massaged her breast and vaginal area, and became sexually aroused.   The victim reported that she tried to stop the assault by telling Nassar that he was hurting her, but Nassar responded that he was "almost done" and continued to assault her.   When Defendant Nassar was done assaulting her he stood in the corner of the room for between 30 to 45 seconds.   The victim thought he was hiding an erection.   After her appointment she told the receptionist at the Sports Medicine Clinic that she wanted to cancel her follow up appointment with Nassar because he made her feel "uncomfortable."[12]

---

12  Ropes & Gray LLP at p. 52-53; DOE Report p. 11; Michigan Attorney General's Report at p. 10.

101.    Upon information and belief, MSU investigated the 2014 complaints through its Office of Institutional Equity (OIE), and some critical facts were omitted from the investigative report including the fact that Nassar was sexually aroused while touching her and that the appointment with Nassar did not end until Thomashow physically removed his hands from her body.

102.    Three months after initiating the investigation, the victim's complaints were dismissed and MSU determined the complainant did not understand the "nuanced difference" between sexual assault and an appropriate medical procedure and deemed Nassar's conduct "medically appropriate" and "[n]ot of a sexual nature."[13]

103.    According to the Title IX report, Nassar explained to Title IX investigators that his massaging of the chest and pelvic regions had a medical purpose, that he had been performing these treatments for a long time and that he teaches and lectures on pelvic floor treatments.    In the Title IX interview, Nassar addressed the student's allegation that the treatment did not stop after her complaint by explaining that he would have understood the student's statement to indicate that his specific hand placement was causing pain rather than an issue with the procedure in general.    Nassar explained that his standard operating procedure is to "explain as he goes," and that he talks throughout his appointments about where he is about to place his hands.    Nassar added that he was "very hurt to think that he violated a patient's trust," that "he was so sorry, that he never had any inappropriate intent and that it especially hurts because helping people is what he does."[14]

13  DOE Report p. 13-15.
14  Ropes & Gray LLP Report at p. 53.

104.    The Title IX report also note that Nassar discussed a slide from a "frequently used power point that contains Star Trek images and is entitled 'Pelvic Floor: Where no man has gone before.'"    Nassar shared his PowerPoint presentations with USAG in 2015 and MSU in 2016 following allegations of abuse, and he "used them to lecture frequently." As Nassar stated to the Title IX investigators, one of his slides is based on a Star Trek theme. The Star Trek slide in his PowerPoint presentation contains a video with scrolling text: "These are the voyages of the 'Sports Pelvic Floor' specialist/Whose life time mission . . . to boldly go where no man has gone before (in most of our young gymnasts – hopefully)." In a different slide, Nassar quotes an 11-year-old gymnast as saying "Larry, I think I hurt my WhoHaa"; in another, Nassar uses the title: "Do your athletes have a PP Problem."[15]

105.    Two of the medical experts consulted by the Office of Institutional Equity in investigating the victim's allegations were Defendants Lemmen and Teachnor-Hauk who were close colleagues of Defendant Nassar.

106.    During the pendency of MSU's OIE investigation, Defendant Nassar was permitted to see patients and he saw approximately 249 patients.[16]

107.    Following the investigation, on or about July 30, 2014, Defendant Strampel sent an e-mail to Defendant Nassar that provided new institutional guidelines and restrictions that Defendant Nassar was subject to including:

    a.    Defendant Nassar was not to examine or treat patients alone but was to be accompanied by a chaperone such as a resident or nurse;

    b.    The alleged "procedure" was to be altered to ensure there would be little to no skin to skin contact when in certain "regions" and if

---

15  Id. at 53-54.
16  DOE Report at p. 10-11.

skin to skin contact was "absolutely necessary" the "procedure" was to be explained in detail with another person in the room for both the explanation and the "procedure;" and,

    c.    New people in the practice were to be "oriented" to ensure understanding with the guidelines.

108.    Defendant Strampel sent a copy of the July 30, 2014 e-mail that outlined Defendant Nassar's restrictions and guidelines to Defendant Dietzel.

109.    At all relevant times, Defendant Dietzel, Defendant Strampel, and Defendant Kovan were acting in a supervisory role to Defendant Nassar.

110.    Nassar ignored or otherwise refused to comply with these guidelines and continued to treat patients alone, and the MSU Defendants did not take appropriate measures to ensure that these institutional guidelines were enforced and adhered to by Nassar.

111.    MSU failed to supervise, oversee or otherwise ensure that Nassar was adhering to the conditions set forth above. From July 2014 to September 2016, MSU continued to permit Nassar unfettered access to female athletes without adequate oversight or supervision to ensure he was complying with the new guidelines.

112.    Upon information and belief, the MSU Defendants failed to take any action to orient new MSU employees to ensure that they were aware of the restrictions placed on Nassar.

113.    In approximately March 2016, Diane Rork was an employee of MSU serving as a registered medical assistant.

114.    Through her employment with MSU, Diane Rork had occasion to work with patients who were to be seen by Defendant Nassar.

-21-

115.    At no point in time was Diane Rork ever told of any restrictions or guidelines regarding Defendant Nassar's treatment of patients.

116.    On one occasion in March 2016, Diane Rork was completing a chart of a girl younger than 13 who was set to be examined by Defendant Nassar in an exam room at Defendant MSU's Sports Medicine Clinic.

117.    Defendant Nassar ordered Diane Rork to leave the room so that he could "treat" the young girl alone.

118.    Diane Rork reported her March 2016 interaction with Defendant Nassar to the MSU Police Department in January 2017.

119.    MSU terminated Diane Rork's employment approximately two weeks later.

120.    In addition, an unnamed registered nurse employed by MSU at the MSU Sports Medicine from approximately 2015 to 2016, has indicated that she was never made aware of any restrictions or guidelines concerning Defendant Nassar.

121.    This unnamed registered nurse was the only registered nurse employed by Defendant MSU's Sports Medicine Clinic during the time of her employment.

122.    From July 2014 to September 2016, despite complaints about Defendant Nassar's conduct and an open criminal investigation into Defendant Nassar's conduct, Defendant MSU continued to permit Defendant Nassar unfettered access to female athletes without adequate oversight or supervision to ensure he was complying with the new guidelines.

123.    On September 1, 2016 another complaint was filed by Rachel Denhollander with MSU's Title IX office alleging that Defendant Nassar assaulted the her during a medical appointment in 2000 at the MSU Sports Medicine Clinic.   Shortly after Denhollander's

-22-

complaints were made public in an article published in The Indianapolis Star on September 12, 2016, MSU took action by sending Defendant Nassar a letter stating his employment was being considered for immediate termination.[17]

124.    On September 16, 2016 MSU Chair of the Department of Radiology and the Dean advised Defendant Nassar that they received claims alleging he "deviated from...required best practices" put into place after the 2014 Title IX investigation and that he was fired.[18]

125.    On December 12, 2016 an investigator with MSU's Title IX office notified Thomashow, the victim who made the report in 2014, that the Title IX office was reviewing her allegations from 2014.   However, on December 19, 2016, the Title IX office sent a follow-up email and letter, which stated that the Title IX office had "reopened" the 2014 investigation but that it would close the file if the victim did not contact the Title IX office that day. The letter added that, if the Title IX office closed the file, the victim could still contact MSU at any time if she wanted to initiate an investigation.[19]

126.    In a memorandum dated January 13, 2017, a different MSU Title IX investigator wrote that she reviewed the Title IX office's file on the victim's 2014 complaint and also reviewed emails between the victim's attorney and the then-Title IX coordinator regarding the complaint. The investigator listed three areas of possible concern with MSU's 2014 investigation, including that MSU failed to interview a potential witness, failed to review the victim's medical records, and failed to send the victim a copy of the final

---

17  DOE Report at p. 15.
18  DOE Report at p. 15-16.
19  Id. at p. 16.

investigation report. MSU did not produce this memorandum to OCR until February 16, 2019. No information was ever produced to show that MSU acted on these concerns.[20]

127. Despite a specific request from the victim's lawyer to reopen the 2014 Title IX investigation, MSU refused to do so stating that the file was closed because of non-participation by the victim.[21]

128. MSU later admitted that due to an "unfortunate oversight" MSU omitted the 2014 investigation file from its review of all sexual harassment complaints filed in the 2011-2012 through 2014-2015 school years. In March 2017 MSU undertook a review of all previously omitted Title IX investigation files to determine whether it needed to take additional action.[22]

129. On or about January 30, 2018 MSU sent the results of its investigation to the Office of Civil Rights (OCR) and concluded that it had properly handled the 2014 report and no additional action was required.[23]

130. OCR inquired with the Title IX Coordinator about any problems she identified with the 2014 investigation. The Title IX Coordinator expressed concerns about MSU's failure to follow up on the victim's statements about Defendant Nassar having an erection in addition to the concerns identified in MSU's January 13, 20017 memorandum that was not produced to OCR until February 16, 2019.[24]

131. On September 5, 2019 the US Department of Education Office for Civil Rights released the results of its investigation of MSU's Title IX compliance regarding the

---

20 Id.
21 Id.
22 Id at p. 17.
23 Id.
24 Id.

employment and conduct of Defendant Nassar.   OCR determined that MSU   "violated the Title IX regulation at 34 C.F.R. §§ 106.8(b) and 106.31 because it failed to promptly and equitably respond to reports and grievances alleging sexual harassment perpetrated by [Defendant Nassar] and the Dean and failed to take appropriate actions reasonably calculated to end the harassment, eliminate the hostile environment, and prevent the harassment from recurring."[25]

132.   After its investigation, OCR also specifically concluded that MSU failed to respond appropriately to the 2014 complaint of sexual assault by Defendant Nassar and its failure caused the victim to be subjected to a sexually hostile environment. In light of the danger posed by Defendant Nassar, MSU also failed to take actions to eliminate any sexually hostile environment created by Defendant Nassar for other students in the University community.[26]

133.   Further, the investigation report of the Independent Special Counsel appointed by the Michigan State Attorney General's Office concluded that MSU's investigation of the 2014 Thomashow complaint was faulty because it did not consult with any experts who were not ties to Defendant Nassar.   The Attorney General's report stated[27]:

> In sum, had (MSU) consulted experts with no ties to Nassar or the MSU's Sports Medicine Clinic, or accurately conveyed Ms. Thomashow's key allegations, it appears likely that the result of the 2014 investigation would have been different.

---

25  Id at p.2.
26  Id at p. 52.
27  Michigan Attorney General's Report at p.14.

134. The Michigan Attorney General's Investigation found that MSU displayed "a lack of institutional control" of the Nassar scandal and violated federal campus safety laws for years by failing to disclose Nassar's sexual abuse. The Report stated[28]:

> **The University's persistent failure to take swift and decisive action to detect and stop Nassar's two-decade long predatory and abusive behavior indicates a lack of institutional control, especially in light of the credible information reported to institutional officials at several points over many years.** This failure, alone, clearly demonstrates the institution's most serious administrative impairments. The University's failure to establish a system of minimally-adequate internal controls and affective lines of communication and coordination with the numerous external agencies and entities where Nassar was authorized to practice medicine under the terms of his employment contract also contributed to the duration and extent of his pattern of criminal activity.
>
> *        *        *
>
> **For these reasons and others noted throughout this Report, the Department finds that the University failed to meet its regulatory responsibilities in numerous and serious ways. Such failures call into question the ability and willingness of Michigan State to meet its obligations to the members of its campus community and to the department.**

135. In a March 14, 2017 interview with Michigan State University Police Department Detective Sergeant Christopher Rozman, Defendant Strampel admitted that the institutional restrictions and guidelines that Defendant Nassar was subject to were illusory in nature because he only shared them with Defendant Dietzel and took no action whatsoever to ensure that the institutional restrictions and guidelines were implemented, followed, or enforced.

136. Defendant Strampel also told Detective Sergeant Rozman that he did not want any other employees in the Sports Medicine Clinic to know that Defendant Nassar had been accused of sexual assault or that Nassar was subject to institutional restrictions or

---

28  Id. at p. 35 (emphasis added).

-26-

guidelines.

137.    Defendant Strampel also admitted to Detective Sergeant Rozman that he did not take any steps to orient any new employees at Defendant MSU's Sports Medicine Clinic to the institutional restrictions or guidelines that Defendant Nassar was purportedly subject to until after Defendant Nassar's termination.

138.    In a March 15, 2017 interview with Michigan State University Police Department Detective Lieutenant Andrea Munford, Michigan State University Police Department Detective Sergeant Christopher Rozman, and Federal Bureau of Investigation Special Agent Rodney Charles, Defendant Teachnor-Hauk stated that she had never had an athlete tell her that Defendant Nassar had made them uncomfortable or that Defendant Nassar had performed digital vaginal penetration.

139.    Defendant Teachnor-Hauk's March 15, 2017 statements to law enforcement were false for the reason that numerous athletes had previously reported concerns of uncomfortable and inappropriate treatment by Defendant Nassar to her, including complaints of digital vaginal penetration by Defendant Nassar under the guise of medical treatment.

140.    Several Plaintiffs were made aware of Defendant Nassar's widespread sexual abuse on or around September 12, 2016 or sometime thereafter through related media coverage.

141.    Others have been made aware of the allegations of Defendant Nassar's conduct more recently through related media coverage.

142.    Defendant Nassar's employment ended with Defendant MSU on approximately September 20, 2016 only after the MSU Defendants became aware that:

    a.    Defendants Nassar and USAG were sued by a former Olympian who alleged she was sexually assaulted by Defendant Nassar; and,

    b.    A former patient of Defendant Nassar, Rachel Denhollander, filed a criminal complaint with the Michigan State University Police Department alleging Defendant Nassar sexually assaulted her when she was 15 years old and seeking treatment for back pain as a result of gymnastics. Ms. Denhollander's allegations of sexual assault by Defendant Nassar included but were not limited to:

        i.    Massaging her genitals;

        ii.    Penetrating her vagina and anus with his finger and thumb; and,

        iii.    Unhooking her bra and massaging her breasts.

143.    Reasons given to Defendant Nassar for his termination included but were not limited to:

    a.    Deviation from "required best practices put in place following the internal sexual harassment investigation conducted ... in 2014;"

    b.    Failure to disclose a 2004 complaint to Meridian Township Police; and,

    c.    Dishonesty by Defendant Nassar when Defendant MSU questioned him about receiving prior complaints about the "procedure" at issue.

144.    Defendant MSU's failure to properly supervise Defendant Nassar and their negligence in retaining Defendant Nassar is in violation of Michigan common law.

145.    In 2004, Defendant Nassar authored a chapter in Principles of Manual Sports Medicine by Steven J. Karageanes.

146.    In the chapter, Defendant Nassar described the pelvic diaphragm, coccyx, and sacroiliac ligaments as an area of the body not fully examined due to its proximity to the genitalia and buttocks, and stated it was "referred to as the 'no fly zone' because of the

many cultural stigmas in touching this area."

147.    Defendant Nassar recommended taking "special measures to explain any examination and techniques applied in this region," and "warning in advance of what you are planning to do," among other suggestions.

148.    There is no mention of intravaginal or intra-rectal techniques or procedures in the chapter.

149.    As described in detail below, Defendant Nassar often failed to follow his own recommendations with Plaintiffs as:

>    a.    He did not explain any intravaginal or intra-rectal techniques to Plaintiffs or their parents; and,
>
>    b.    He did not warn Plaintiffs he was going to engage in vaginal or anal digital penetration before doing so.

150.    Shortly after MSU terminated Defendant Nassar's employment, Defendant Klages requested the MSU Women's Gymnastics Team members to sign a card for the team to show their support for Defendant Nassar-despite the fact that Defendant Klages was aware that Defendant Nassar's employment had been terminated due to numerous claims of sexual assault against patients and athletes.

151.    Defendant Klages also passionately defended Defendant Nassar to the MSU Women's Gymnastics Team and told her athletes that she would trust her own grandkids with him—despite the numerous allegations of sexual assault against Defendant Nassar and the existence of open criminal investigations into his conduct.

152.    In September 2016, following MSU's termination of Defendant Nassar's employment, MSU Athletic Department's Director of Athletic Communications, Jamie Weir Baldwin, instructed members of the MSU Women's Gymnastics Team not to speak to the

media or post on their social media accounts regarding Defendant Nassar's actions.

153.   Based on the communications of the MSU Athletic Department, members of the MSU Women's Gymnastics Team believed that they would be punished by MSU or face consequences if they came forward to the police or media to describe sexual assaults against them.

154.   In December 2016, following the filing of federal child pornography charges against Defendant Nassar, Defendant Klages continued to defend Defendant Nassar and told the parent of one of Defendant Nassar's victims that the child pornography "could have been planted" by somebody suing Defendant Nassar and also continued to deny that Defendant Nassar had sexually assaulted any patients by suggesting that the victims had "misinterpreted the treatment."

155.   MSU did not directly encourage the members of the MSU Women's Gymnastics Team to report suspected abuse by Defendant Nassar to the police until February 2017-approximately 5 months after MSU terminated Defendant Nassar's employment.

156.   In late November 2016, Defendant Nassar was arrested and charged in Ingham County, Michigan on three charges of first-degree criminal sexual conduct with a person under 13, and was later released on a $1 million bond.

157.   Following the filing of federal child pornography charges against Defendant Nassar, Defendant Klages continued to defend Defendant Nassar and told the parent of one of Defendant Nassar's victims that the child pornography "could have been planted" by somebody suing Defendant Nassar and also continued to deny that Defendant Nassar had sexually assaulted anyone

158.    In mid-December 2016, Defendant Nassar was indicted, arrested, and charged in the United States District Court for the Western District of Michigan in Grand Rapids, Michigan on charges of possession of child pornography and receipt/attempted receipt of child pornography.

159.    According to the federal indictment, Defendant Nassar:

a.    Knowingly received and attempted to receive child pornography between approximately September 18, 2004 and December 1, 2004;

b.    Knowingly possessed thousands of images of child pornography between approximately February 6, 2003 and September 20, 2016, including images involving a minor who was under the age of 12.

160.    Testimony given by an FBI agent at a hearing held on December 21, 2016, alleged, among other allegations, that Defendant Nassar used a GoPro camera to record video images of children in a swimming pool and that:

a.    Defendant Nassar's hand can be seen grabbing one girl's hand and shoving it into the vaginal area of another girl; and

b.    Defendant Nassar's thumb can be seen pressing into a child's vagina/vaginal area.

161.    In mid-January 2017, Brooke Lemmen, D.O. submitted a letter of resignation to Mr. Strampel amid allegations that she:

a.    Removed several boxes of confidential treatment patient records from Defendant MSU's Sports Medicine clinic at Defendant Nassar's request;

b.    Did not disclose to Defendant MSU that Defendant USAG was investigating Defendant Nassar as of July 2015; and

c.    Made a staff member feel pressured not to fully cooperate in an internal investigation into allegations against Defendant Nassar.

162.    On or about February 7, 2017, Nassar was indicted an additional child pornography related charge in the United States District Court for the Western District of

Michigan in Grand Rapids, Michigan

163.    On February 7, 2017, a superseding indictment added an additional count of "Destruction and Concealment of Records and Tangible Objects" alleging between September 19, 2016 and September 20, 2016, Defendant Nassar "caused a third-party vendor to permanently delete and destroy all images, records, documents, and files contained on the hard drive of a laptop computer, and the defendant threw in the trash a number of external hard drives."

164.    On February 17, 2017, following a preliminary examination, Defendant Nassar was ordered to stand trial on three charges of first-degree criminal sexual conduct with a person under 13 in Ingham County following testimony, which included, among other, allegations of digital vaginal penetration at Defendant Nassar's residence.

165.    On February 22, 2017, Defendant Nassar was arraigned on 22 counts of first-degree criminal sexual conduct with a person under 13 years old, and 14 counts of third-degree criminal sexual conduct with a person under 13 years old in Ingham County, Michigan and Eaton County, Michigan.

166.    In a March 14, 2017 interview with Michigan State University Police Department Detective Sergeant Christopher Rozman, Defendant Strampel admitted that the institutional restrictions and guidelines that Defendant Nassar was subject to were illusory in nature because he only shared them with Defendant Dietzel and took no action whatsoever to ensure that the institutional restrictions and guidelines were implemented, followed, or enforced.

167.    Defendant Strampel also told Detective Sergeant Rozman that he did not want any other employees in the Sports Medicine Clinic to know that Defendant Nassar had

-32-

been accused of sexual assault or that Nassar was subject to institutional restrictions or guidelines.

168.    Defendant Strampel also admitted to Detective Sergeant Rozman that he did not take any steps to orient any new employees at Defendant MSU's Sports Medicine Clinic to the institutional restrictions or guidelines that Defendant Nassar was purportedly subject to until after Defendant Nassar's termination

169.    On March 17, 2017, Defendant MSU's Office of Institutional Equity released a Title IX report concluding that Defendant Nassar sexually assaulted one of his patients, Rachael Denhollander, in or about 2000. The report stated that evidence supports a finding that Defendant Nassar "committed these acts in a sexual manner regardless of whether it was done for medical purposes."

170.    At least three more internal Title IX investigations conducted by Michigan State University following the Title IX investigation for Rachael Denhollander determined Larry Nassar violated University policy.

171.    Defendant Nassar's preliminary examinations on the second set of charges in Ingham County was held on May 12, 2017, May 26, 2017, and June 23, 2017.

172.    At the conclusion of the preliminary examinations, Defendant Nassar was ordered to stand trial on 12 counts of first-degree criminal sexual conduct following testimony by Rachael Denhollander and others, which included among others, allegations of digital vaginal penetration by Defendant Nassar.

173.    Defendant Nassar's preliminary examination on the charges issued in Eaton County, Michigan was held on June 30, 2017.

174.    At the conclusion of the preliminary examination, Defendant Nassar was

ordered to stand trial on 7 counts of first-degree criminal sexual conduct following testimony, which included among others, allegations of digital vaginal penetration by Defendant Nassar.

175.   Nassar faced a total of 22 counts of first-degree criminal sexual conduct in Circuit Court – 15 in Ingham County, Michigan and 7 in Eaton County, Michigan.

176.   On or about July 11, 2017, Defendant Nassar pled guilty in his federal criminal case to: (1) Receipt and Attempted Receipt of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A); (2) Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B); and (3) Destruction and Concealment of Records and Tangible Objects, in violation of 18 U.S.C. § 1519.

177.   On November 11, 2017 Defendant Nassar pleaded guilty to seven counts of first-degree criminal sexual conduct in Ingham County Circuit Court.

178.   On November 29, 2017 Defendant Nassar pleaded guilty to three counts of first-degree criminal sexual conduct in Eaton County Circuit Court.

179.   On December 7, 2017 Defendant Nassar was sentenced in the United States District Court for the Western District of Michigan by District Court Judge Janet T. Neff to three twenty-year sentences to be served consecutively on his convictions for (1) Receipt and Attempted Receipt of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A); (2) Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B); and (3) Destruction and Concealment of Records and Tangible Objects, in violation of 18 U.S.C. § 1519.

180.   On January 24, 2018, Defendant Nassar was sentenced in the Ingham County Circuit Court for the State of Michigan by the Honorable Rosemarie E. Aquilina to 40 to 175

years in prison on seven sexual assault charges.

181.    On February 5, 2018, Defendant Nassar was sentenced in the Eaton County Circuit Court for the State of Michigan by the Honorable Janice K. Cunningham to 40 to 125 years in prison on three sexual assault charges.

182.    The acts, conduct, and omissions of the MSU Defendants, and their policies, customs, and practices with respect to investigating sexual assault allegations severely compromised the safety and health of Plaintiffs and an unknown number of individuals, and have resulted the sexual assault, battery, molestation, and harassment of Plaintiffs by Defendant Nassar, which has been devastating for Plaintiffs and her family.

183.    A special, confidential, and fiduciary relationship was created between Plaintiffs and Defendant Nassar when Plaintiffs sought medical treatment from Defendant Nassar in the course of his employment, agency, and/or representation of the MSU Defendants, resulting in Defendant Nassar owing Plaintiffs a duty to disclose known acts of sexual assault, battery, molestation, and harassment against Plaintiffs.

184.    A special, confidential, and fiduciary relationship was created between Plaintiffs and the MSU Defendants when Plaintiffs sought medical treatment from Defendant Nassar in the course of his employment, agency, and/or representation of the MSU Defendants, resulting in the MSU Defendants owing Plaintiffs a duty to disclose known acts of sexual assault, battery, molestation, and harassment against Plaintiffs.

185.    A special, confidential, and fiduciary relationship was created and existed between Nassar and the MSU Defendants, resulting in the MSU Defendants owing Plaintiffs a duty to disclose known acts of sexual assault, battery, molestation, and harassment to Plaintiffs.

-35-

186.    This action arises from Defendants' blatant disregard for Plaintiffs' federal and state rights, and Defendants' deliberately indifferent and unreasonable response to physician-on-patient/physician-on-student/physician-on-athlete sexual assault, battery, molestation, and harassment.

## ALLEGATIONS SPECIFIC TO PLAINTIFFS

187.    The names of the Plaintiffs have been withheld from this Complaint to protect their identities as many of the Plaintiffs were minor children at the time the sexual abuse occurred and the allegations involve injuries of a personal and sensitive nature.

**A.      Plaintiff JANE DOE BR**

188.    Plaintiff JANE DOE BR is a minor.

189.    Plaintiff treated with Defendant Nassar between 2009 and 2016 at the Michigan State Sports Medicine Clinic.

190.    At all times during her treatment with Defendant Nassar, Plaintiff was a minor.

191.    Defendant Nassar, while treating Plaintiff, would fondle Plaintiff's breasts, genitals and buttocks, and put his hands underneath her leotard and shorts.

192.    Defendant Nassar committed this fondling of Plaintiff without gloves, and under Plaintiff's leotard and shorts without providing notice to her or her parents, or obtaining consent from either her or her parents.

193.    Plaintiff believes the conduct of Defendant Nassar was sexual assault, abuse, molestation and harassment performed for Defendant Nassar's sexual pleasure and gratification.

## ALLEGATIONS OF FRAUDULENT CONCEALMENT

194.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

195.    Plaintiffs hereby allege that the MSU Defendants committed Fraudulent Concealment by committing Fraud, as described in detail above and below, and concealing the existence of Plaintiffs' claims and that Plaintiffs had a cause of action against the MSU Defendants at the time Defendant Nassar's sexual assaults occurred making a material representation(s) to Plaintiffs involving a past or existing fact by:

       a.      Making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal or anal penetration;

       b.      Making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

       c.      Making the statement, explaining, that his acts and/or conduct was "checking your sternum;"

       d.      Making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

       e.      Making the statement, explaining, that his acts and/or conduct was medical "treatment" or for a legitimate medical purpose;

       f.      Making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [ther] ribs;" and,

       g.      Making a statement, explaining to Plaintiffs and another medical professional; that the position of his hand was in an appropriate place, when it was not and while he was digitally penetrating Plaintiffs, all which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

196.    The material representation(s) to Plaintiffs were false, in that he was actually performing them for his own sexual gratification and pleasure evidenced by his observed arousal, flushed face, and closing of the eyes during the conduct.

197.    When    Defendants'    agents    and    employees    made    the    material

representation(s), they knew that they were false, in that they knew that the "treatment[s]" were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty and/or sports therapist.

198.    Defendants made the material representation(s) with the intent that the material representation(s) should be acted or relied upon by Plaintiffs or their parents, such that Plaintiffs:

        a.     Should believe that the "treatments" were in fact legitimate medical "treatments;"

        b.     Should believe that the "treatment[s]" were proper, appropriate, and legitimate;

        c.     Should not believe that they had been sexually assaulted;

        d.     Should not believe that they had been sexually assaulted so that he could prevent discovery of his sexual assaults;

        e.     Should continue the "treatment[s]" so that he could continue to sexually assault them;

        f.     Should not question and/or report the conduct to appropriate authorities; and

        g.     Should not reasonably believe and not be aware of a possible cause of action that they had against Defendant Nassar and/or Defendant MSU.

199.    Plaintiffs acted in reliance upon the material representation(s), in that Plaintiffs:

        a.     Reasonably believed that the "treatments" were in fact "treatments;"

        b.     Reasonably believed that the "treatments" were proper, appropriate, and legitimate;

        c.     Reasonably did not believe that they had been sexually assaulted;

        d.     Believed that they should continue the "treatment[s];"

        e.     Did not believe that they should question and/or report the conduct to appropriate authorities; and,

      f.      Did not reasonably believe that they had, and were not aware of, a possible cause of action that they had against Defendant Nassar and/or the MSU Defendants.

200.    Plaintiffs thereby suffered injury, in that Plaintiffs:

      a.      Could not stop the sexual assault;

      b.      Continued to undergo the "treatment[s]" and sexual assaults;

      c.      And suffered discomfort, bleeding, urinary tract infections, bacterial infections, related physical manifestations thereof, sleep deprivation, physical illness, vomiting, severe emotional distress, shock, humiliation, fright, grief, embarrassment, loss of self-esteem, disgrace, loss of familial relationships, loss of enjoyment of life and will continue to suffer pain of mind and body, was prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity, among other injuries more fully described below.

201.    Concealing the fraud by making a fraudulent material representation(s) to Plaintiffs that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that he made a material representation(s) to Plaintiffs involving a past or existing fact by:

      a.      Making the statement, explaining, that his acts and/or conduct were a "new procedure" which involved vaginal or anal penetration;

      b.      Making the statement, referring to his conduct, disguised as "treatment," as a pelvic adjustment;

      c.      Making the statement, explaining, that his acts and/or conduct was "checking [her] sternum;"

      d.      Making the statement, explaining, that his acts and/or conduct was doing a "breast exam;"

      e.      Making the statement, explaining, that his acts and/or conduct was medical "treatment" for a legitimate medical purpose and that it was the same that he performed on Olympic athletes;

      f.      Making the statement, explaining, that his acts and/or conduct was "attempting to manipulate [her] ribs;" and,

-39-

g.      Making the statement that the position of his hand was in an appropriate place—when it was not-while he was digitally penetrating Plaintiffs, all of which were made contemporaneously and/or shortly after the abrupt, sudden, quick, and unexpected sexual assaults by Defendant Nassar.

202.    Defendants' agents and employees concealed the fraud by affirmative act(s) that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that Defendant Nassar:

a.      Positioned himself in a manner in which parents or chaperones in the room could not see his conduct, so that he could conceal and prevent discovery of his conduct;

b.      Dismissed a medical professional from the room, during an examination of Plaintiffs while he was digitally penetrating Plaintiffs, who questioned the placement of his hands;

c.      Prevented other medical professionals, chaperones, parents, guardians, and/or caregivers from being in the room during examinations and treatments of Plaintiffs so that he could sexually assault Plaintiffs;

d.      Did not abide by or follow the standard and care which requires another medical professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients;

e.      Did not abide by or follow the restrictions that had been put into place in 2014 by Defendant MSU restricting his examination and treatment of patients only with another person in the room; and,

f.      Gave Plaintiffs, at appointments, gifts such as t-shirts, pins, flags, leotards, and other items, some with USAG logos and others without, in order to gain their trust.

203.    The actions and inactions of Defendants, as described in the preceding paragraphs, constituted Fraudulent Concealment.

204.    At all times pertinent to this action, Defendant Nassar was an agent, apparent agent, servant, and employee of Defendant MSU and operated within the scope of his

-40-

employment and his negligence is imputed to Defendant MSU.

205. At all times material hereto, Plaintiffs were entirely free of any negligence contributing to the injuries and damages hereinafter alleged.

206. Plaintiffs did not know, could not have reasonably known, and were reasonably unaware of a possible cause of action that they had against Defendant Nassar and/or Defendant MSU until the September 12, 2016 publication of a story regarding a complaint filed with Defendant MSU's Police Department, titled "Former USA Gymnastics doctor accused of Abuse," or sometime thereafter, for the following reasons among others:

a. Plaintiffs reasonably relied on the Fraud committed by Defendant Nassar by his material representations and concealment of the true nature of his "treatments[s]"and his actions;

b. Plaintiffs were minors at the time of the assaults and "treatments;"

c. Plaintiffs did not know what a legitimate and appropriately performed intra-vaginal or intra-anal/rectal treatment was like because they had never experienced and/or had an intra-vaginal or intra-anal/rectal treatment before;

d. Plaintiffs had never experienced and/or had an intra-vaginal treatment before because they had never been treated by a physician and/or therapist that performed them;

e. Plaintiffs did not know what a legitimate and appropriately performed pelvic, vaginal, anal, and/or breast exam was like because they had never experienced and/or had a pelvic, vaginal, anal, and/or breast exam before;

f. Plaintiffs had never experienced and/or had a pelvic and/or vaginal exam before because pelvic and/or vaginal exams are not recommended and routinely performed until a female reaches at least the age of 18 years old, pursuant to longstanding recommendations in the literature, expert opinions, treatment guidelines, and position statement from the American Academy of Pediatrics, American Academy of Family Physicians, American Cancer Society, American College of Obstetricians and Gynecologists, American Society for Clinical Pathology, and American Society for Colposcopy and Cervical Pathology;

-41-

g.     Plaintiffs had never experienced and/or had a breast exam before
       because breast exams are not recommended and routinely performed
       until a female reaches at least the age of 21 years old, pursuant to
       longstanding recommendations in the literature, expert opinions,
       treatment guidelines, and position statement from the American
       Academy of Pediatrics, American Academy of Family Physicians,
       American Cancer Society, American College of Obstetricians and
       Gynecologists, American Society for Clinical Pathology;

h.     Because of these recommendations and never having had one of these
       treatments or exams, it was very difficult if not impossible for
       Plaintiffs to differentiate a legitimate and appropriately performed
       intra-vaginal treatment, pelvic, vaginal, anal, and/or breast exam from
       a sexual assault;

i.     Plaintiffs could not have possibly known because there were no
       parents, chaperones, guardians, caregivers, and/or other medical
       professionals in the room during the "treatments" to observe,
       question, and/or discover that his "treatments" were sexual assaults
       and inform Plaintiffs that they had been sexually assaulted and had a
       cause of action against Defendant Nassar;

j.     In the instances where a parent was present in the room, Defendant
       Nassar's actions to conceal the physical assaults from the view of the
       parents prevented the parents from discovering that his "treatments"
       were sexual assaults and informing Plaintiffs that they had been
       sexually assaulted and had a cause of action against Defendant Nassar;

k.     Based on Neuroscience, the prefrontal cortex of the brain, which we
       use to make decisions and distinguish right from wrong, is not fully
       formed until around the age of 23;

l.     Based on Neuroscience, as the prefrontal cortex of the brain matures
       teenagers are able to make better judgments;

m.     Plaintiffs were intimidated by Defendant Nassar's notoriety and
       reputation and therefore believed his misrepresentations that the
       "treatment[s]" were legitimate and appropriate;

n.     Plaintiffs trusted Defendant Nassar due to his notoriety and
       reputation;

o.     Plaintiffs trusted Defendant Nassar because he groomed them to
       believe that his "treatments" were legitimate;

p.     Plaintiffs trusted and felt that Defendant Nassar was a friend because
       at appointments he gave Plaintiffs gifts such as t-shirts, pins, flags,

-42-

leotards, and other items, some with USAG logos and others without, in order to gain their trust;

q.  Plaintiffs had no reason to believe or be aware that they could possibly sue or had a possible cause of action because they were minors who were not knowledgeable or aware of the civil justice system;

r.  Plaintiffs had no reason to believe or be aware that they could possibly sue or had a possible cause of action because they were minors who were not knowledgeable or aware of any remedy at law;

s.  Plaintiffs had no reason to believe or be aware that they could possibly sue or had a possible cause of action evidenced by the fact that so many other girls had been sexually assaulted by Defendant Nassar over the past few decades, none of them had a reason to believe or be aware that they could possibly sue or had a possible cause of action in the past; and none of them have ever sued him in the past;

t.  Plaintiffs were never told by Defendant Nassar that his conduct was sexual in nature and not legitimate and appropriate "treatment[s]" and to conceal the sexual conduct from their parents and others, unlike other victims of sexual abuse who are typically told by their perpetrators that their conduct is of a sexual nature and to conceal the sexual conduct from their parents and others;

u.  Plaintiffs were compelled by Defendant Nassar to undergo "treatment[s]" like other athletes if they wanted to continue being involved in the relevant sport, and that therefore, the "treatments" were legitimate and appropriate;

v.  Plaintiffs were minors and young athletes; therefore, they were easily suggestible; and,

w.  Plaintiffs had never previously heard about any allegations in the media regarding sexual assaults or misconduct by Defendant Nassar.

207.  Defendant MSU's sports medicine trainers, trainers, employees, staff, managers, supervisors, directors, agents, apparent agents, and/or servants made material representation(s) to Plaintiffs involving a past or existing fact by making statements that:

a.  Defendant Nassar was an "Olympic doctor" and "knew what he was doing" in regard to performing appropriate "treatments;"

b.    Defendant Nassar was a "world-renowned doctor" and that "it was legitimate medical treatment," in regard to the legitimacy and appropriateness of the "treatments;"

c.    Defendant Nassar's conduct was "not sexual abuse,"

d.    Defendant Nassar was a "world-renowned doctor;" and,

e.    Defendant Nassar's conduct and "treatment[s]" were "medically appropriate" and "[n]ot of a sexual nature" because the complainant "didn't understand the "nuanced difference" between sexual assault and an appropriate medical procedure."

208.    The material representation(s) to Plaintiffs were false, in that the MSU Defendants had previously received strikingly similar complaints of abuse by Defendant Nassar from other patients, students, and student athletes and knew that the appropriateness of his "treatment[s]" had been questioned in the past.

209.    When the MSU Defendants made the material representation(s), they knew that they were false and/or made the material representation(s) recklessly, without any knowledge of their truth and as a positive assertion, in that they knew that Defendant MSU had previously received strikingly similar complaints of abuse by Defendant Nassar from other students and student athletes and knew that the appropriateness of his "treatment[s]" had been questioned in the past.

210.    The MSU Defendants made the material representation(s) with the intent that the material representation(s) should be acted upon by Plaintiffs, in that Plaintiffs:

a.    Should believe that the "treatments" were in fact "treatments;"

b.    Should believe that the "treatment[s]" were proper, appropriate, and legitimate;

c.    Should not believe that they had been sexually assaulted;

d.    Should not question and/or report the conduct to other authorities; and,

-44-

     e.     Should not reasonably believe and not be aware of a possible cause of action that they had against Defendant Nassar and/or the MSU Defendants.

211.   Plaintiffs acted in reliance upon the material representation(s), in that Plaintiffs:

     a.     Reasonably believed that the "treatments" were in fact "treatments;"

     b.     Reasonably believed that the "treatments" were proper, appropriate, and legitimate;

     c.     Reasonably did not believe that they had been sexually assaulted;

     d.     Reasonably believed that they should continue the "treatment[s];"

     e.     Did not believe that they should question and/or report the conduct to appropriate authorities; and,

     f.     Did not reasonably believe that they had, and was not aware of, a possible cause of action that they had against Defendant Nassar and/or Defendant MSU.

212.   Plaintiffs thereby suffered injury, in that Plaintiffs:

     a.     Could not stop the sexual assault;

     b.     Continued to undergo the "treatment[s]" and sexual assaults; and,

     c.     Suffered discomfort, bleeding, urinary tract infections, bacterial infections, related physical manifestations thereof, sleep deprivation, physical illness, vomiting, severe emotional distress, shock, humiliation, fright, grief, embarrassment, loss of self-esteem, disgrace, loss of familial relationships, loss of enjoyment of life and will continue to suffer pain of mind and body, was prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity, among other injuries more fully described below.

213.   The MSU Defendants concealed the fraud by making a fraudulent material representation(s) to Plaintiffs that was/were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that they made

-45-

a material representation(s) to Plaintiffs involving a past or existing fact by:

    a.    Making the statement that Defendant Nassar was an "Olympic doctor" and "knew what he was doing" in regard to performing appropriate "treatments;"

    b.    Making the statement that Defendant Nassar was a "world-renowned doctor" and that "it was legitimate medical treatment," in regard to the legitimacy and appropriateness of the "treatments;"

    c.    Making the statement that Defendant Nassar's conduct was "not sexual abuse," that he was a "world-renowned doctor;" and,

    d.    Making the statement that Defendant Nassar's conduct and "treatment[s]" were "medically appropriate" and "[n]ot of a sexual nature" because the complainant "didn't understand the "nuanced difference" between sexual assault and an appropriate medical procedure;"

214. The MSU Defendants concealed the fraud by affirmative acts that were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud, in that they:

    a.    Ignored, refused, and failed to inquire, question, and investigate the complaints and take action regarding Defendant Nassar's "treatments;"

    b.    Did not create a policy to require adults, parents, chaperones, guardians, and/or caregiver's presence during an examination of a minor or female by a physician; and,

    c.    Did not enforce the restrictions that had been put into place in 2014 by Defendant MSU restricting his examination and treatment of patients only with another person in the room;

215. Plaintiffs did not know, could not have reasonably known, and were reasonably unaware of a possible cause of action that they had against Defendant Nassar and/or the MSU Defendants until the September 12, 2016 publication of a story regarding a complaint filed with Defendant MSU's Police Department, titled "Former USA Gymnastics doctor accused of Abuse," or shortly thereafter, for the following reasons among others:

-46-

a.    Plaintiffs reasonably relied on the Fraud committed by Defendant Nassar by his material representations and concealment of the true nature of his "treatments[s]"and his actions;

b.    Plaintiffs were minors at the time of the assaults and "treatments;"

c.    Plaintiffs did not know what a legitimate and appropriately performed intra-vaginal treatment was like because they had never experienced and/or had an intra-vaginal treatment before;

d.    Plaintiffs had never experienced and/or had an intra-vaginal treatment before because they had never been treated by a physician and/or therapist that performed them;

e.    Plaintiffs did not know what a legitimate and appropriately performed pelvic, vaginal, anal, and/or breast exam was like because they had never experienced and/or had a pelvic, vaginal, anal, and/or breast exam before;

f.    Plaintiffs had never experienced and/or had a pelvic and/or vaginal exam before because pelvic and/or vaginal exams are not recommended and routinely performed until a female reaches at least the age of 18 years old, pursuant to longstanding recommendations in the literature, expert opinions, treatment guidelines, and position statement from the American Academy of Pediatrics, American Academy of Family Physicians, American Cancer Society, American College of Obstetricians and Gynecologists, American Society for Clinical Pathology, and American Society for Colposcopy and Cervical Pathology, to name a few.

g.    Plaintiffs had never experienced and/or had a breast exam before because breast exams are not recommended and routinely performed until a female reaches at least the age of 21 years old, pursuant to longstanding recommendations in the literature, expert opinions, treatment guidelines, and position statement from the American Academy of Pediatrics, American Academy of Family Physicians, American Cancer Society, American College of Obstetricians and Gynecologists, American Society for Clinical Pathology;

h.    Because of these recommendations and never having had one of these treatments or exams, it was very difficult, if not impossible, for Plaintiffs to differentiate a legitimate and appropriately performed intra-vaginal treatment, pelvic, vaginal, anal, and/or breast exam from a sexual assault;

i.     Plaintiffs could not have possibly known because there were no parents, chaperones, guardians, caregivers, and/or other medical professionals in the room during the "treatments" to observe, question, and/or discover that his "treatments" were sexual assaults and inform Plaintiffs that they had been sexually assaulted and had a cause of action against Defendant Nassar;

j.     In the instances where a parent was present in the room, Defendant Nassar's actions to conceal the physical assaults from the view of the parents prevented the parents from discovering that his "treatments" were sexual assaults and informing Plaintiffs that they had been sexually assaulted and had a cause of action against Defendant Nassar;

k.     Based on Neuroscience, the prefrontal cortex of the brain, which we use to make decisions and distinguish right from wrong, is not fully formed until around the age of 23;

l.     Based on Neuroscience, as the prefrontal cortex of the brain matures, teenagers are able to make better judgments;

m.     Plaintiffs were intimidated by Defendant Nassar's notoriety and reputation and therefore believed his misrepresentations that the "treatment[s]" were legitimate and appropriate;

n.     Plaintiffs trusted Defendant Nassar due to his notoriety and reputation;

o.     Plaintiffs trusted Defendant Nassar because he groomed them to believe that his "treatments" were in fact legitimate "treatments;"

p.     Plaintiffs trusted and felt that Defendant Nassar was a friend because he gave Plaintiffs, at appointments, gifts such as t-shirts, pins, flags, leotards, and other items, some with USAG logos and others without, in order to gain their trust;

q.     Plaintiffs had no reason to believe or be aware that they could possibly sue or had a possible cause of action because they were minors who were not knowledgeable or aware of the civil justice system;

r.     Plaintiffs had no reason to believe or be aware that they could possibly sue or had a possible cause of action because they were minors who were not knowledgeable or aware of any remedy at law;

s.     Plaintiffs had no reason to believe or be aware that they could possibly sue or had a possible cause of action evidenced by the fact that so many other girls had been sexually assaulted by Defendant

-48-

Nassar over the past few decades, none of them had a reason to believe or be aware that they could possibly sue or had a possible cause of action in the past; and none of them have ever sued him in the past;

t.    Plaintiffs were never told by Defendant Nassar that his conduct was sexual in nature and not legitimate and appropriate "treatment[s]" and to conceal the sexual conduct from their parents and others, unlike other victims of sexual abuse who are typically told by their perpetrators that their conduct is of a sexual nature and to conceal the sexual conduct from their parents and others;

u.    Plaintiffs were compelled by Defendant Nassar to undergo "treatment[s]" like other athletes if they wanted to continue being involved in their relevant sport, and therefore, the "treatments" were legitimate and appropriate;

v.    Plaintiffs were minors; therefore, they were easily suggestible;

w.    Plaintiffs had never previously heard about any allegations in the media regarding sexual assaults or misconduct by Defendant Nassar.

x.    Plaintiffs reasonably relied on the Fraud committed by Defendant MSU by their material representations and concealment of the true nature of Defendant Nassar's "treatments[s]"and his actions;

y.    Plaintiffs trusted Defendant MSU that they would protect Plaintiffs from harm and not hire, employee, and/or retain a physician that had, was, or would perform illegitimate and/or inappropriate "treatment[s]," engage in inappropriate conduct, and/or sexually assault patients, students, and/or athletes;

z.    Plaintiffs were never told by Defendant MSU that Defendant Nassar's conduct and "treatment[s]" was inappropriate and sexual assault, to the contrary, Plaintiffs were told that Defendant Nassar's conduct and "treatment[s]" were appropriate and legitimate "treatment[s]," "not sexual abuse," "medically appropriate," and "[n]ot of a sexual nature" from a "world-renowned" and "Olympic doctor," who "knew what he was doing" and that Plaintiffs, because of their age and inexperience with intra-vaginal treatment, pelvic, vaginal, anal, and/or breast exams, "didn't understand the 'nuanced difference' between sexual assault and an appropriate medical procedure;"

aa.    Plaintiffs reasonably relied on Defendant MSU to protect them and Defendant MSU's statements; and,

-49-

bb. Plaintiffs were compelled by Defendant MSU to undergo "treatment[s]" like other athletes if they wanted to continue being involved in their relevant sport, and therefore, the "treatments" were legitimate and appropriate.

216. The actions and inactions of the MSU Defendants and their agents and employees, as described in the preceding paragraphs, constituted Fraudulent Concealment.

217. At all times pertinent to this action, Defendant Nassar was an agent, apparent agent, servant, and employee of Defendant MSU and operated within the scope of his employment and his Fraudulent Concealment is imputed to Defendant MSU.

218. The actions and inactions of the sports medicine trainers, trainers, employees, staff, managers, supervisors, and directors of the MSU Defendants, as described in the preceding paragraphs, constituted Fraudulent Concealment.

219. At all times pertinent to this action, the sports medicine trainers, trainers, employees, staff, managers, supervisors, and directors of Defendant MSU were agents, apparent agents, servants, and employees of Defendant MSU and operated within the scope of their employment and their Fraudulent Concealment is imputed to Defendant MSU.

220. At all times material hereto, Plaintiffs were entirely free of any negligence contributing to the injuries and damages hereinafter alleged.

### COUNT I
### VIOLATION OF TITLE IX OF THE EDUCATION ACT OF 1972, 20 U.S.C. § 1681 *et seq*
### (Against MSU and MSU Individual Defendants in Their Official Capacities)

221. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

222. Title IX, 20 U.S.C. § 1681(a) provides in pertinent part:

*"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be*

> *subjected to discrimination under any education program or activity receiving Federal financial assistance. . ."*

223. "Title IX also protects third parties from sexual harassment or violence in a school's education programs and activities."

224. Under Title IX, sexual harassment is any type of unwelcome conduct of a sexual nature. "It includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature."

225. Plaintiffs are each a "person" within the meaning of 20 U.S.C. §1681(a).

226. Defendant MSU receives financial assistance for its education program and is therefore subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. § 1681, *et seq.*

227. The U.S. Department of Education's Office of Civil Rights has explained that Title IX covers all programs of a school, and extends to sexual harassment and assault by employees, students, and third parties.

228. Defendant Nassar's actions and conduct were carried out under one of Defendant MSU's programs, which provides medical treatment and medical care to students, including student athletes, and members of the general public.

229. Defendant Nassar's sexual assault, battery, molestation, and harassment of Plaintiffs, including the massaging of breasts and vaginal areas, constitutes sexual discrimination and harassment under Title IX.

230. Defendant MSU exercised control over Nassar and his provision of treatment and services to patients at all times throughout his employment with MSU.

231. Nassar was employed at MSU from 1993-2016 and held various positions

-51-

during that time including as an unpaid clinical instructor; sports medicine fellow; assistant professor; associate professor; team physician for the University's women's gymnastics and crew teams; performing outreach and community service activities; providing medical services to intercollegiate athletic teams; and providing medical treatment to the public through the Sports Medicine Clinic.

232.    Plaintiffs, as patients of Nassar and the MSU Sports Medicine Clinic, operated by Michigan State University, were participants in and beneficiaries of a federally assisted education program or activity.

233.    The Sports Medicine Clinic is operated by MSU's Division of Sports Medicine, which is comprised of University employees. Physicians in the Division of Sports Medicine are also University faculty members.

234.    Nassar's provision of treatment and services to Plaintiffs, at all times under the aegis of MSU, constituted part of an education program or activity receiving Federal financial aid or assistance.

235.    Nassar's sexual assaults were carried out under the guise of legitimate medical treatment as part of a program offered by MSU's Sports Medicine Clinic, which offers medical treatment to students, athletes, and the public.

236.    Defendant Nassar's sexual assault, battery, molestation, and harassment of Larissa Boyce, Christie Achenbach, and Tiffany Thomas Lopez constituted sexual discrimination and harassment under Title IX.

237.    Reports of sexual misconduct made in 1995, 1997/1998-1999, 2000, 2002, 2013, 2013-14, and 2014 were made to employees who were designated as mandatory reporters and who had authority to institute corrective measures.

238.    Defendant MSU had actual knowledge of the sexual assault, abuse, and serial molestation committed by an MSU doctor and specifically Defendant Nassar.

239.    Defendants were notified by Jessica Brutlag of sexual abuse by an MSU doctor in 1995; by Larissa Boyce and Jane B8 Doe of abuse by Nassar in or around 1997/1998; by Christie Achenbach in or around 1999; and by Tiffany Thomas Lopez in 2000 on more than one occasion.

240.    The MSU Defendants were notified again in 2014 of Nassar's conduct when Plaintiff Jane D1 Doe reported to MSU's Office of Institutional Equity that she had an appointment with Nassar to address hip pain and was sexually abused and molested by Defendant Nassar when he cupped her buttocks, massaged her breast and vaginal area, and he became sexually aroused.

241.    Three months after MSU's OIE office initiated an investigation, in July 2014, the victim's complaints were dismissed and Defendant MSU determined she didn't understand the "nuanced difference" between sexual assault and an appropriate medical procedure and deemed Defendant Nassar's conduct "medically appropriate" and "not of a sexual nature."

242.    Pursuant to Title IX, Defendant MSU is obligated and required to investigate all allegations of sexual assault, battery, molestation, and harassment, including allegations that sexual assault, battery, molestation, and harassment has been committed by an employee, student, or third party.

243.    Defendant MSU owed Plaintiffs duties under Title IX, which duties included not to engage in and be deliberately indifferent to known sexual assault, battery, molestation, harassment, and other sexual misconduct.

-53-

244.   Upon information and belief, an "appropriate person" at MSU, within the meaning of Title IX, including but not limited to, Kathie Klages, Kelli Bert, Lianna Hadden, Destiny Teachnor-Hauk, Gary Stollak, and other trainers and coaches, had actual and constructive notice of sexual assault, battery, molestation, and harassment committed by Defendant Nassar in 1997/1998, 1999, 2000, 2001/2002, 2004 and 2014, as described herein this Complaint.

245.   The MSU Defendants failed to carry out their duties to investigate and take corrective action, as well as to make appropriate recommendations, including informed consent, under Title IX following the complaints of sexual assault, as described herein.

246.   Despite the complaints and concerns conveyed to Defendant MSU employees, agents, and/or representatives as described herein, allegations went unaddressed, which violated reporting policies and procedures and Title IX and was done in a manner that was reckless, grossly negligent, and deliberately indifferent.

247.   The MSU Defendants acted with indifference and in a clearly unreasonable manner by failing to respond to the allegations of sexual assault, abuse, and molestation in light of the known circumstances, Defendant Nassar's conduct toward female athletes, and his access to young girls and young women.

248.   The MSU Defendants acted with deliberate indifference to known acts of sexual assault, abuse, and molestation on its premises by:

　　　a.　　failing to report alleged sexual assaults to MSU Police or the office of OIE for further investigation, as mandated by its own policy;

　　　b.　　failing to investigate and address complaints by Jessica Brutlag, Larissa Boyce, Jane B8 Doe, Christie Achenbach, Tiffany Thomas Lopez, and others, as required by Title IX;

c.   failing to institute corrective measures to prevent MSU doctors and Nassar from violating and sexually abusing other students and individuals, including minors from 1995 forward.

d.   failing to objectively investigate and address the 2014 complaint regarding Nassar's conduct; and,

e.   failing to supervise and implement safeguards and corrective actions to prevent further assaults.

249.   The MSU Defendants' deliberate indifference is further confirmed by the Department of Education's investigation into MSU's handling of sexual assault and relationship violence allegations, which revealed:

a.   That the MSU Defendants' failure to adequately respond to allegations of sexual assault created a sexually hostile environment and affected numerous students and staff on MSU's campus;

b.   That the MSU Defendants' failure to address complaints of sexual violence in a prompt and equitable manner caused and may have contributed to a continuation of the sexually hostile environment.

250.   The MSU Defendants' responses were clearly unreasonable as Defendant Nassar continued to sexually assault female athletes and other individuals until he was discharged from the University in 2016.

251.   MSU Defendants had actual and constructive knowledge of, but were recklessly and deliberately indifferent to, Defendant Nassar's sexual assault, battery, molestation, and harassment in between 1997 and/or 1998 and 2016.

252.   Defendant MSU's failure to investigate and take corrective actions to complaints of Defendant Nassar's sexual assault, battery, molestation, and harassment in 1997/1998, 1999, 2000, 2001/2002, 2004, and 2014 led to others, including Plaintiffs, being sexually assaulted, battered, molested, and harassed by Defendant Nassar.

253.   The MSU Defendants were notified again in 2014 of Defendant Nassar's

conduct when Amanda Thomashow reported she had an appointment with Defendant Nassar to address hip pain and was sexually abused and molested by Defendant Nassar when he cupped her buttocks, massaged her breast and vaginal area, and he became sexually aroused.

254.    Amanda Thomashow reported to Defendant MSU facts which were omitted or withheld from the investigative report including but not limited to the following:

      a.     Defendant Nassar was sexually aroused while touching her;

      b.     The appointment with Defendant Nassar did not end until she physically removed his hands from her body.

255.    Three months after initiating an investigation, in July 2014, Amanda Thomashow's complaints were dismissed and Defendant MSU determined she didn't understand the "nuanced difference" between sexual assault and an appropriate medical procedure and deemed Defendant Nassar's conduct "medically appropriate" and "not of a sexual nature."

256.    In addition, MSU produced two different versions of the report in response to the July 2014 investigation—one version was sent to Amanda Thomashow and a different version was sent to Defendant Nassar and other MSU personnel.

257.    Following the 2014 investigation, Defendant Nassar became subject to new institutional guidelines, including requirements that Defendant Nassar minimize or eliminate skin-to-skin contact and to have a chaperone in the room.

258.    The MSU Defendants failed to adequately supervise or otherwise ensure Defendant Nassar complied with the newly imposed institutional guidelines even though the MSU Defendants had actual knowledge that Defendant Nassar posed a substantial risk

of additional sexual abuse of the females whom he had unfettered access.

259.    Defendant MSU's deliberate indifference before, during, and after the sexual assault, battery, molestation, and harassment of Plaintiffs was in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*.

260.    Defendant MSU's failure to properly and appropriately investigate and take corrective action under Title IX for the 1995, 1997/1998, 1999, 2000, 2001/2002, 2004, 2013, 2013-2014, and 2014 complaints of Defendant Nassar's sexual assault, battery, molestation, and harassment resulted in Plaintiffs being subject to further sexual assault, battery, molestation, harassment, and a sexually hostile environment.

261.    The MSU Defendants' failure to promptly and appropriately investigate and remedy and respond to the sexual assaults after they received notice on multiple occasions between 1995-2016 subjected Plaintiffs to further harassment and a sexually hostile environment, effectively denying them access to educational opportunities at MSU, including medical care.

262.    Defendant MSU's responses to the complaints 1995, 1997/1998, 1999, 2000, 2001/2002, 2004, 2013, 2013-2014, and 2014 were clearly unreasonable as Defendant Nassar continued to sexually assault young females until he was discharged from the University in 2016.

263.    As a result of MSU's deliberate indifference to prior reports of sexual assault by Nassar, Plaintiffs were deprived of access to educational opportunities and benefits provided by MSU through its Division of Sports Medicine and Sports Medicine Clinic.

264.    Plaintiffs were excluded from, denied the benefits of, and such deprivation amounts to discrimination under the programs and activities offered by MSU through its Sports Medicine Clinic.

265.    Such deprivation was severe and pervasive

266.    The MSU Defendants failed to offer counseling services to current or former patients of Defendant Nassar, including Plaintiffs.

267.    As a direct and proximate result of the MSU Defendants' actions and inactions, Plaintiffs have suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earning and loss of earning capacity; and have required and will continue to require mental health treatment, therapy, and counseling, to address the mental anguish and despair caused by Defendants' actions.

## COUNT II
### VIOLATION OF THE AFFORDABLE CARE ACT, 42 U.S.C. § 18116, *et seq*
#### (AGAINST DEFENDANT MSU AND DEFENDANT MSU BOARD OF TRUSTEES IN THEIR OFFICIAL CAPACITIES)

268.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

269.    Section 1557 of the Patient Protection and Affordable Care Act, which is codified at 42 U.S.C. § 18116, provides that:

> Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the

ground prohibited under . . . Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under . . . Title IX shall apply for purposes of violations of this subsection.

270.    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. prohibits sex discrimination in programs that receive federal financial assistance.

271.    The Affordable Care Act ("ACA") Section 1557 became law on March 23, 2010.   This Count applies to all Plaintiffs injured by the unlawful conduct of Defendants on or after March 23, 2010.

272.    Plaintiffs, as women, have a right under 42 U.S.C. § 18116 to receive health care services free from discrimination on the basis of sex.

273.    Plaintiffs are "individuals" within the meaning of 42 U.S.C. § 18116.

274.    Section 1557 does not establish any standing requirements other than being an "individual" who on the basis of sex is subject to discrimination in the receipt of benefits from a "Health Program or Activity." 42 C.F.R § 92.101 and § 92.206.

275.    Unlike Title IX, the statute from which Congress adopted the remedies in implementing Section 1557, a plaintiff's status as a student or non-student is irrelevant to the question of standing to bring a claim under Section 1557 of the ACA.

276.    The current United States Department of Education, Office of Civil Rights website contains this information about Title IX:

Q:      Does Title IX protect only students?

A:      No. Title IX protects all persons from discrimination, including parents and guardians, students, and employees

277.    Defendant MSU receives Federal financial assistance within the meaning of 42 U.S.C. § 18116 because it receives federal financial assistance such as credits, subsidies, or contracts of insurance.

278.    MSU is a covered entity under the ACA and MSU's activity described herein constitutes a "Health Program or Activity" as defined in the Section 1557 regulations. 42 C.F.R § 92.6

279.    MSU Trustees are sued in their official capacities only.

280.    MSU exercised substantial control over Nassar and the context in which the known harassment and sexual assaults occurred.

281.    MSU employed the services of Defendant Nassar, doctors, and other professional and non-professional health care providers who cared for Plaintiffs from approximately 1997 to 2016, and held themselves out to the public as competent, careful, and experienced in the care and treatment of patients

282.    According to the findings of fact contained in the official report of the United States Department of Education, Office of Civil Rights ("DOE Report") issued on September 5, 2019 states:

"[Nassar] also engaged in outreach and community service activities outside of the University. Such activities were often considered among his job duties. For instance, [Nassar's] 2013 performance evaluation contained a section on "Service and Outreach" discussing his community activities. One such outreach activity was [Nassar's] volunteer work with USA Gymnastics, the national governing body of gymnastics in the United States. From 1996 to 2014, [Nassar] served as the national medical coordinator for USA Gymnastics. In this role, he frequently traveled to national and international gymnastics competitions, including the Olympics.

-60-

[Nassar] was well known in the gymnastics community for his work with USA Gymnastics. University employees told OCR that Employee X was so well known and respected in the gymnastics community that the University leveraged his reputation to recruit athletes to its gymnastics team and patients to its Sports Medicine Clinic."

283.   The above findings of fact establish that MSU exercised substantial control over Nassar and the context in which the known harassment and sexual assaults occurred even when Nassar was permitted to sexually assault women and girls at sites other than MSU   locations.

284.   Plaintiffs received medical care from Defendant Nassar at the MSU Sports Medicine Clinic, other MSU related facilities, and at other locations where Nassar provided services as an MSU employee.

285.   Plaintiffs expected to receive medical care for their injuries without being sexually assaulted and without fear of sexual harassment or assault

286.   Defendant Nassar's conduct and actions toward Plaintiffs, that being nonconsensual and assaultive digital vaginal penetration, touching of Plaintiffs' vaginal area, touching of Plaintiffs' genitals and buttocks constitute sex discrimination under Title IX and Section 1557 and otherwise denied Plaintiff the benefits of appropriate medical care.

287.   The DOE Report made findings of fact establishing that Nassar's sexual misconduct was reported to "appropriate persons" as that term is defined by court interpretation of Title IX and MSU's mandatory reporting obligations contained in its current "Policy on Relationship Violence and Sexual Misconduct" and earlier iterations of this written policy.

288.   The DOE Report findings (pages 7-8) establish that "appropriate persons"

-61-

received complaints of Nassar's inappropriate sexual conduct or behavior on 8 separate occasions including in 1997(Reporter 2), 1998-1999 (Reporter 3),1999 (Reporter 4),2000(Reporter 5),2002 (Reporter 7),2013 (Reporter 8), 2013-2014 (Reporter 9),2014 (Reporter 10).

289.    The knowledge of each person identified in the DOE Report as having received a complaint concerning Nasssar's sexual abuse is imputed to MSU.

290.    According to the DOE Report (p.41), MSU is liable for the harassment committed by Nassar even if did not know of the harassment.    The DOE Report provides:

" In cases where an employee is engaged in sexual harassment of a student, a school may be held responsible under Title IX regardless of whether it knew or should have known about the harassment. Specifically, if an employee, in the context of carrying out his or her day-to-day job responsibilities for providing aid, benefits, or services to students, engages in harassment that denies or limits a student's ability to participate in or benefit from the school's program, the school is responsible for discrimination, whether or not it knew or should have known about it. The following factors are considered in determining whether an employee has engaged in harassment in the context of the employee's provision of aid, benefits or services to students: (1) the type and degree of responsibility given to the employee, including both formal and informal authority, to provide aid, benefits, or services to students, to direct and control student conduct, or to discipline students generally; (2) the degree of influence the employee has over the particular student involved, including the circumstances in which the harassment took place; (3) where and when the harassment occurred; (4) the age and educational level of the student involved; and (5) as applicable, whether, in light of the student's age and educational level and the way the school is run, it would be reasonable to believe that the employee was in a position of responsibility over the student, even if the employee was not. The school is therefore also responsible for remedying any effects of the harassment on the students, as well as for ending the harassment and preventing its recurrence. As noted above, this is true whether or not the recipient has "notice" of the harassment. "

291.    Notwithstanding the DOE's Report holding MSU liable for a Title IX violation   and by implication Section 1557 even if it did not know of Nassar's sexual abuse of his patients, MSU had "actual knowledge" of Nassar's sexual abuse so that if Nassar was

removed from service in the 1990s the injuries to all of the Plaintiffs would have been prevented.

292. Because of MSU's inaction and deliberate indifference and failure to act on actual knowledge of Nassar's sexual abuse of his patients, MSU forced Plaintiffs to endure unnecessary pain, trauma, humiliation, and duress.

293. Because of Plaintiffs' sex, MSU treated Plaintiffs with a lack of care, dignity, and respect.

294. The conduct of the MSU described above constitutes sex discrimination against Plaintiffs in violation of Section 1557 of the ACA.

295. MSU failed to promptly and appropriately investigate, respond to, and remedy the sexual assaults after they received repeated notice of Nassar's wrongdoing subjected Plaintiffs and countless others to further sexual harassment and sexual assaults as well as a sexually hostile environment—effectively denying them all access to health programs or activities at MSU, and effectively denying them the benefits of appropriate medical care in violation of Section 1557 of the ACA.

296. MSU's actions were intentional and deliberately indifferent to reports of Nassar's sexual abuse starting in the 1990's and reoccurring throughout the 1990s and 2000s.

297. MSU's handling of the 2014 Thomashow complaint was in violation of Section 1557 in that MSU Title IX investigator knew that Nassar had sexually abused Ms. Thomashow and wrote a fraudulent Title IX investigation report to cover-up Nassar's conduct.

298.   The knowledge of MSU's Title IX investigator handing the Thomashow complaint is imputed to MSU.

299.   As a direct and proximate result of the MSU Defendants' actions and inactions, Plaintiffs have suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earning and loss of earning capacity.

300.   In the alternative, the actions or inaction of the MSU Defendants was deliberately indifferent or so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continues to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity.

## COUNT III
## VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983
## DUE PROCESS DENIAL OF ACCESS TO JUDICIAL REMEDIES AND CONSPIRACY TO DENY THE SAME
## (Against Defendant Moore and Defendant Lemmen)

301.   Plaintiffs incorporate by reference the allegations contained in the previous

paragraphs.

302.   The due process clause of the 14th Amendment protects individuals from

governmental action which "shocks the conscience" and is designed to deprive a Plaintiff of

the right to a judicial remedy to redress wrongful governmental conduct.

303.   In conducting MSU's Title IX investigation into Ms. Thomashow's complaints

about Nassar's conduct during a medical treatment, Moore was informed that Nassar had

sexually assaulted Thomashow.

304.   Ms. Thomashow, then a 24-year-old who routinely suffered from hip pain

stemming from old cheerleading injuries, sought out Nassar's help in March of 2014.

305.   Ms. Thomashow informed Ms. Moore that for the first hour of the

examination and treatment, there was a female resident present. After excusing the female

resident, Nassar had Thomashow lie down on a table. Nassar than excused the female

resident. As soon as the resident left, Nassar began his sexually assault of Ms. Thomashow.

For a couple of minutes he massaged her breast until she asked him to stop. Then he

massaged her back and worked his way to her bottom before touching her vagina.. Nassar

was barehanded when he repeatedly touched her vaginal area, under her underwear

Nassar continued despite her complaints of pain and her repeated attempts to make him

stop. During that time, he also made an off-hand comment about how her boyfriend needed

to give her better massages. Nassar massaged her with three fingers in a circular motion

-65-

around the vaginal area and on the vagina. During the "treatment" Nassar was sexually aroused. She told Moore that "if I hadn't said anything, he would've inserted a finger in me." She said that she had to literally stand up and push him off her. She was stunned as she put her clothes back on. He wouldn't let her leave the room until she made a follow-up appointment, which she later canceled. After leaving Nassar's office, she called the office to cancel the appointment and told the receptionist that she "felt violated."

306. Moore solicited advice from Dr. Lemmen as an impartial "expert witness" in an effort to ascertain if Nassar's conduct could be fairly characterized as "medical treatment."

307. Documents recently produced by MSU indicate that Lemmen was not impartial and was in fact acting as an advocate for Nassar who she described as a close friend.

308. Discovery documents reveal that Moore permitted Lemmen to write portions of the Title IX Report and permitted her to make false and misleading statements designed to exonerate Nassar.

309. Moore and Lemmen conspired to produce a fraudulent Title IX Report designed to mischaracterize Ms. Thomashow's clear report of an egregious sexual assault.

310. The conspiracy to produce a fraudulent Title IX Report had the effect of rendering Plaintiffs' judicial remedies untimely and inadequate or ineffective in violation of Plaintiffs' due process right to access to judicial remedies.

311. This fraudulent conduct "shocks the conscience".

312. Moore and Lemmen acted under color of state law and they are not entitled to the defense of qualified immunity because they knew or should have known that their

conduct violates    clearly established due process rights.

313.    The cover-up rendered Plaintiffs' judicial remedies untimely and inadequate or ineffective and impaired the underlying causes of action so that Plaintiffs would be unable pursue a timely or effective judicial remedy.

314.    If Moore and Lemmen had not conspired to cover-up the true nature of Nassar's conduct, Plaintiffs would have brought causes of actions well within the time permitted for such cases without resort to tolling arguments.

COUNT IV
VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983
(Against Defendant Klages, Defendant Strampel, Defendant Dietzel, and Defendant Kovan)

315.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

316.    Plaintiffs, as females, are members of a protected class under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

317.    Plaintiffs enjoy the constitutionally protected Due Process right to be free from the invasion of bodily integrity through sexual assault, battery, molestation, and harassment.

318.    At all times pertinent hereto, Defendants Klages, Strampel, Kovan, Dietzel, Lemmen, and Nassar were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendant Michigan State University.

319.    The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, of which reasonable persons in the MSU Defendants'

position should have known.

320.   Defendants Klages, Strampel, Dietzel, and Kovan had, at all times pertinent hereto, the ultimate responsibility and authority to train and supervise their employees, agents, and representatives, in the appropriate manner of detecting, reporting, and preventing sexual abuse, assault, and molestation and as a matter of acts, custom, policy, and/or practice failed to do so with deliberate indifference.

321.   At all times pertinent hereto, Defendants Strampel, Dietzel, and Kovan acted in a supervisory role to Defendant Nassar through their roles at the MSU Sports Medicine Clinic, MSU's College of Osteopathic Medicine, and other affiliated MSU departments or institutions.

322.   At all times pertinent hereto, Defendant Klages, as the head coach of the MSU Women's Gymnastics Team, acted in a supervisory role to Defendant Nassar while he was acting as team physician to the MSU Women's Gymnastics Team.

323.   As a matter of custom, policy, and/or practice, Defendant Klages had the ultimate responsibility and authority to investigate complaints from her athletes that involved allegations of impropriety or sexual assault by her team physician.

324.   As a matter of custom, policy, and/or practice, Defendants Klages, Strampel, Dietzel, and Kovan had and have the ultimate responsibility and authority to investigate complaints against their employees, agents, and representatives from all individuals including, but not limited to students, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

325.   Defendant Lemmen's actions in assisting to exonerate Defendant Nassar from wrongdoing in response to the 2014 Title IX investigation and Defendant Lemmen's

removal of Defendant Nassar's patient medical records from the MSU Sports Medicine Clinic at Defendant Nassar's request demonstrate the existence of an agreement or conspiracy between Defendant Nassar and Defendant Lemmen to deprive Plaintiffs of their constitutional rights.

326.     Defendants Klages, Strampel, Dietzel, Lemmen, Kovan, and Nassar had a duty to prevent sexual assault, abuse, and molestation of MSU's patients, athletes, and other members of the public who utilize MSU's resources, those duties arising under the above-referenced constitutional rights.

327.     Defendant MSU's internal policies provide that "[a]ll University employees . . . are expected to promptly report sexual misconduct or relationship violence that they observe or learn about and that involves a member of the University community (faculty, staff or student) or occurred at a University event or on University property." They further provide that "[t]he employee must report all relevant details about the alleged relationship violence or sexual misconduct that occurred on campus or at a campus-sponsored event."

328.     This policy was violated in or around 1997 and/or 1998 when Larissa Boyce and Jane B8 Doe reported sexual assault, abuse, and molestation by Defendant Nassar to Defendant Kathie Klages, and Defendant Klages refused to report the incident and instead intimidated, humiliated, and embarrassed Larissa Boyce and Jane B8 Doe.

329.     Defendant Klages's violation of the policy by refusing to take any action in response to legitimate and credible claims of sexual assault by Larissa Boyce and Jane B8 Doe resulted in the continued violations of Plaintiffs' constitutional rights, including her Due Process right to bodily integrity, which includes the right to be free from sexual assaults.

330.    Defendant Klages's actions as alleged above also demonstrate the existence of an agreement or conspiracy between Defendant Nassar and Defendant Klages to deprive Plaintiffs of their constitutional rights.

331.    By failing to prevent the aforementioned sexual assault, abuse, and molestation upon Plaintiffs, and by failing to appropriately respond to numerous reports of Defendant Nassar's sexual assault, abuse, and molestation in a manner that was so clearly unreasonable it amounted to deliberate indifference, Defendants Klages, Strampel, Dietzel, Lemmen, Kovan, and Nassar are liable to Plaintiffs pursuant to 42 U.S.C. § 1983.

332.    Defendants Klages, Strampel, Dietzel, Lemmen, Kovan, and Nassar are also liable to Plaintiffs under 42 U.S.C. § 1983 for maintaining customs, policies, and practices which deprived Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

333.    Defendants Klages, Strampel, Dietzel, Lemmen, and Kovan tolerated, authorized and/or permitted a custom, policy, practice or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline Defendant Nassar, with the result that Defendant Nassar was allowed to violate the constitutional rights of persons such as Plaintiffs with impunity.

334.    As a direct and proximate result of the MSU Defendants' and Defendant Nassar's actions and/or inactions, Plaintiffs have suffered and continues to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continues to

-70-

sustain loss of earning and loss of earning capacity.

335.     In the alternative, the actions or inactions of Defendants Klages, Strampel, Dietzel, Lemmen, and Kovan were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continues to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## COUNT V
## FAILURE TO TRAIN AND SUPERVISE, 42 U.S.C. § 1983
## (Against Defendants Klages, Strampel, Deitzel, and Kovan)

336.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

337.     Defendants Klages, Strampel, Dietzel, and Kovan had, at all times pertinent hereto, the ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives, including Defendant Nassar and all faculty and staff, regarding their duties toward students, faculty, staff, and visitors.

338.     Defendants Klages, Strampel, Dietzel, and Kovan failed to train and supervise its employees, agents, and/or representatives, including all faculty and staff, regarding the following duties:

a.      Perceive, report, and stop inappropriate sexual conduct on campus;

b.      Provide diligent supervision over student-athletes and other individuals;

c.      Report suspected incidents of sexual abuse or sexual assault;

d.      Ensure the safety of all students, faculty, staff, and visitors to Defendant MSU's campuses premises;

e.      Provide a safe environment for all students, faculty, staff, and visitors to Defendant MSU's premises free from sexual harassment; and,

f.      Properly train faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

339.    The above list of duties is not exhaustive.

340.    Defendants Klages, Strampel, Dietzel, and Kovan failed to adequately train coaches, trainers, medical staff, and others regarding the aforementioned duties which led to violations of Plaintiffs' rights.

341.    As a result, Defendants Klages, Strampel, Dietzel, and Kovan deprived Plaintiffs of rights, including those described herein, secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

342.    As a direct and proximate result of Defendants' actions and/or inactions, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

343.    In the alternative, the actions or inaction of the Defendants Klages, Strampel,

Dietzel, and Kovan were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity.

### COUNT VI
### GROSS NEGLIGENCE
### (Against the MSU Defendants and Defendant Nassar)

344.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

345.    The MSU Defendants owed Plaintiffs a duty of ordinary care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents, including Defendant Nassar.

346.    Defendant Nassar owed Plaintiffs a duty to use ordinary care in providing medical treatment as an employee, agent, and/or representative of the MSU Defendants.

347.    A special, confidential, and fiduciary relationship was created between Plaintiffs and Defendant Nassar when Plaintiffs sought medical treatment from Defendant Nassar in the course of his employment, agency, and/or representation of the MSU Defendants, resulting in Defendant Nassar owing Plaintiffs a duty to use due care.

348.    A special, confidential, and fiduciary relationship was created and existed at all times pertinent hereto between the MSU Defendants and Defendant Nassar, as described herein this Complaint, resulting in The MSU Defendants owing Plaintiffs a duty to use due care.

349.    The MSU Defendants and their employees, agents, and/or representatives had a duty to report suspected sexual abuse.

350.    Defendant MSU's internal policies provide that "[a]ll University employees ... are expected to promptly report sexual misconduct or relationship violence that they observe or learn about and that involves a member of the University community or occurred at a University event or on University property." They state further: "[t]he employee must report all relevant details about the alleged relationship violence or sexual misconduct that occurred on campus or at a campus-sponsored event...."

351.    Defendant MSU's aforementioned internal policies were violated when the MSU Defendants took no actions to address the following complaints regarding Defendant Nassar's conduct:

> a.    Larissa Boyce and Jane B8 Doe in or around 1997/1998;
>
> b.    Christie Achenbach in or around 1999;
>
> c.    Tiffany Thomas Lopez in 2000 (on more than one occasion);
>
> d.    Jennifer Rood Bedford between approximately 2000 and 2002;
>
> e.    Kyle Stephens in or around 2004; and
>
> f.    Jane D1 Doe in or around 2014.

352.    The MSU Defendants' failure to address Larissa Boyce, Jane B8 Doe, Christie Achenbach, Tiffany Thomas Lopez, and Jennifer Rood Bedford, and Kyle Stephens'

complaints led to Plaintiffs being victimized, sexually assaulted, abused, and molested by Defendant Nassar

353.    The MSU Defendants had notice of complaints of a sexual nature related to Defendant Nassar's purported treatment with young girls and women through Defendant MSU employees, agents, and/or representatives as early as 1997/1998, again in 1999, again in 2000, again in 2001/2002, again in 2004, and again in 2014, as described herein this Complaint.

354.    The MSU Defendants and their employees, agents, and/or representatives failed to report sexual abuse about which they knew or should have known in 1997/1998, 1999, 2000, 2001/2002, 2004, and 2014, as described herein this Complaint.

355.    Defendants Klages, Teachnor-Hauk, Stollak, Kovan, Dietzel, and Strampel were the moving forces or causes of repeated constitutional injuries to Plaintiffs based on their failures to report, train, supervise, investigate, or otherwise act in response to complaints of Defendant Nassar's conduct.

356.    Additionally, the MSU Defendant's failure to properly address Jane D1 Doe's 2014 complaint regarding Defendant Nassar's conduct also led to Plaintiffs being victimized, sexually assaulted, abused and molested by Defendant Nassar.

357.    The MSU Defendants' failure to adequately train and supervise Defendant Nassar, especially after the MSU Defendants knew or should have known of complaints regarding Defendant Nassar's conduct, was so reckless as to demonstrate a substantial lack of concern for whether injury resulted to Plaintiffs.

358.    The MSU Defendants' (including but not limited to Defendants Klages, Stollak, Teachnor-Hauk) failure to report Defendant Nassar to law enforcement or MSU

upon receiving complaints of sexual abuse was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

359.    Following the 2014 Title IX investigation regarding Jane D1 Doe, the MSU Defendants' (including but not limited to Defendants Strampel, Kovan and Dietzel) failure to inform MSU Sports Medicine Clinic staff of the conditions Defendant Nassar was subject to regarding modifying the "procedure," limiting skin-on-skin contact, and having chaperones in the room was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs

360.    Defendant Nassar's conduct in sexually assaulting, abusing, and molesting Plaintiffs in the course of his employment, agency, and/or representation of the MSU Defendants and under the guise of rendering "medical treatment" was so reckless as to demonstrate a substantial lack of concern for whether injury would result to Plaintiffs.

361.    The MSU Defendants' conduct and the conduct of their individual employees and agents demonstrated a willful disregard for precautions to ensure Plaintiffs' safety.

362.    The MSU Defendants knew or should have known of complaints pertaining to Defendant Nassar's nonconsensual sexual touching and assaults that occurred under the guise of medical treatment.

363.    The MSU Defendants' conduct demonstrated a willful disregard for substantial risks to Plaintiffs.

364.    The MSU Defendants breached duties owed to Plaintiffs and were grossly negligent when they conducted themselves in the manner described herein this Complaint. These acts by the MSU Defendants were committed with reckless disregard to Plaintiffs' safety, health, constitutional and/or statutory rights, and with substantial lack of concern

to whether injury resulted to Plaintiffs.

365.    The MSU Defendants failed to warn or advise current and former patients of Defendant Nassar, including Plaintiffs, that allegations could surface that in fact the treatments that the patients received was not medical treatment at all but was potentially sexual assault.

366.    The MSU Defendants failed to offer counseling services to current of former patients of Defendant Nassar, including Plaintiffs.

367.    The actions of the MSU Individual Defendants are not subject to the immunities afforded by the Governmental Tort Liability Act, MCL 691.1407, as their actions amounted to gross negligence.

368.    The MSU Individual Defendants' actions, as described in the preceding paragraphs of this Complaint, amounted to conduct so reckless as to demonstrate a substantial lack of concern for whether injury resulted to Plaintiff. The MSU Individual Defendants' actions, therefore, amounted to gross negligence under the Governmental Tort Liability Act such that Plaintiff's claims are not subject to the immunities allowed by the Act.

369.    The MSU Individuals' actions, as described is the preceding paragraphs of this Complaint, furthermore amounted to willful and wanton conduct that evidenced indifference to whether harm would result. As such, Plaintiff's claims are not subject to the immunities allowed by the Governmental Tort Liability Act.

370.    Furthermore, as it pertains to Defendants Kovan, Dietzel, Lemmen, and Stollack, their actions, as described in preceding paragraphs of this Complaint, are not subject to the Governmental Tort Liability Act based on MCL 691.1407(4) as these

individuals are licensed healthcare professionals who obtained their knowledge of Nassar's conduct during the course of patient treatment and failed to act upon the same

371.   As a direct and proximate result of the MSU Defendants' and Defendant Nassar's actions and/or inactions, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

372.   As a direct and/or proximate result of Defendants' gross negligence, Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

373.   The grossly negligent conduct of the MSU Individual Defendants, as described above, was the direct and proximate result of Larry Nassar having access to and the ability to sexually molest Plaintiff. The MSU Individual Defendants' conduct, taking all possible proximate causes into account, was the one most immediate, efficient, and direct cause of Plaintiff being injured and sustaining damages

<u>COUNT VII</u>
<u>NEGLIGENCE</u>
<u>(Against the MSU Defendants and Defendant Nassar)</u>

374.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

375.    The MSU Defendants owed Plaintiffs a duty to use ordinary care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, agents, and/or representatives, including Defendant Nassar.

376.    Defendant Nassar owed Plaintiffs a duty to use ordinary care in providing medical treatment as an employee, agent, and/or representative of the MSU Defendants.

377.    A special, confidential, and fiduciary relationship was created between Plaintiffs and Defendant Nassar when Plaintiffs sought medical treatment from Defendant Nassar in the course of his employment, agency, and/or representation of the MSU Defendants, resulting in Defendant Nassar owing Plaintiffs a duty to use ordinary care in his undertakings.

378.    A special, confidential, and fiduciary relationship was created and existed at all times pertinent hereto between the MSU Defendants and Defendant Nassar, as described herein this Complaint, resulting in The MSU Defendants owing Plaintiffs a duty to use ordinary care in their undertakings.

379.    The MSU Defendants and their employees, agents, and/or representatives had a duty to report suspected sexual abuse.

380.    The MSU Defendants had notice of complaints of a sexual nature related to Defendant Nassar's purported treatment with young girls and women through Defendant MSU employees, agents, and/or representatives as early as 1997/1998, again in 1999,

-79-

again in 2000, again in 2001/2002, again in 2004, and again in 2014, as described herein this Complaint.

381.  The MSU Defendants and their employees, agents, and/or representatives failed to report sexual abuse about which they knew or should have known in 1997/1998, 1999, 2000, 2001/2002, 2004, and 2014, as described herein this Complaint.

382.  The MSU Defendants knew or should have known of the foreseeability of sexual abuse with respect to youth and collegiate sports.

383.  The MSU Defendants' failure to properly address, investigate, and remedy complaints against Defendant Nassar's conduct was a breach of the duty to use ordinary care.

384.  Defendant Nassar's conduct in sexually assaulting, battering, molesting, and harassing Plaintiffs in the course of his employment, agency, and/or representation of the MSU Defendants under the guise of proper medical treatment was a breach of the duty to use ordinary care.

385.  The MSU Defendants' failure to adequately train and supervise Defendant Nassar breached the duty of ordinary care.

386.  The MSU Defendants failed to warn or advise current and former patients of Defendant Nassar, including Plaintiffs, that allegations could surface that in fact the treatments that the patients received was not medical treatment at all but was potentially sexual assault.

387.  The MSU Defendants failed to offer counseling services to current of former patients of Defendant Nassar, including Plaintiffs.

388.  As a direct and proximate result of Defendants' actions and/or inactions,

-80-

Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

**COUNT VIII**
**VICARIOUS LIABILITY**
**(Against the MSU Defendants)**

389.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

390.    Vicarious liability is indirect responsibility imposed by operation of law where an employer is bound to keep its employees within their proper bounds and is responsible if it fails to do so.

391.    Vicarious liability essentially creates agency between the principal and its agent so that the principal is held to have done what the agent has done.

392.    The MSU Defendants employed and/or held Defendant Nassar out to be its employee, agent, and/or representative from approximately 1996 to 2016.

393.    Defendant MSU's website contains hundreds of web pages portraying Defendant Nassar as a distinguished member of Defendant MSU's College of Osteopathic Medicine, Division of Sports Medicine.

394.    A special, confidential, and fiduciary relationship was created and existed at all times pertinent hereto between the MSU Defendants and Defendant Nassar, as described herein this Complaint, resulting in The MSU Defendants owing Plaintiffs a duty to

prevent them from suffering Defendant Nassar's sexual assault, battery, molestation, and discrimination.

395.     The MSU Defendants are vicariously liable for the actions of Defendant Nassar, as described above, that were performed during the course of his employment, agency, and/or representation with the MSU Defendants and while he had access to young female patients on Defendant MSU's campus and premises through its College of Osteopathic Medicine and Division of Sports Medicine.

396.     The MSU Defendants had actual and/or constructive knowledge of Defendant Nassar's propensity for sexually assaulting, battering, molesting, and harassing females on several occasions under the guise of medical treatment and during the course of his employment, agency, and/or representation with the MSU Defendants, beginning in 1997 and/or 1998, as described herein this Complaint.

397.     The MSU Defendants had actual and/or constructive knowledge of Defendant Nassar's propensity for sexually assaulting, battering, molesting, and harassing his patients and other females under the guise of medical treatment and during the course of his employment, agency, and/or representation with the MSU Defendants, and took no action to prevent such conduct.

398.     It was reasonably foreseeable that Defendant Nassar would continue to sexually assault, batter, molest, and harass females under the guise of medical treatment during the course of his employment, agency, and/or representation with the MSU Defendants, with the actual and/or constructive knowledge the MSU Defendants had of such conduct.

399.     As a direct and proximate result of Defendant Nassar's actions carried out in

the course of his employment, agency, and/or representation of the MSU Defendants, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

## COUNT IX
### EXPRESS/IMPLIED AGENCY
### (Against the MSU Defendants)

400.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

401.    An agent is a person who is authorized by another to act on its behalf.

402.    The MSU Defendants intentionally and/or negligently made representations that Defendant Nassar was their employee, agent, and/or representative.

403.    On the basis of those representations, Plaintiff reasonably believed that Defendant Nassar was acting as an employee, agent, and/or representative of the MSU Defendants.

404.    Plaintiffs were injured as a result of Defendant Nassar's sexual assault, abuse, and molestation, as described above. These acts were performed during the course of Defendant Nassar's employment, agency, and/or representation with the MSU Defendants while he had access to young females.

405.    Plaintiffs were injured because they relied on the MSU Defendants to provide employees, agents, and representatives who exercise reasonable skill and care.

406. As a direct and proximate result of Defendant Nassar's actions carried out in the course of his employment, agency, and/or representations of the MSU Defendants, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

407. In the alternative, the actions or inactions of the MSU Defendants were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continues to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff was prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity.

## COUNT X
### NEGLIGENT SUPERVISION
### (Against MSU Defendants)

408. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

409.   The MSU Defendants had a duty to provide reasonable supervision of their employee, agent, and/or representative, Defendant Nassar, while he was in the course of his employment, agency, and/or representation with the MSU Defendants and while he interacted with young females, including Plaintiffs.

410.   Given the known sexual abuse in youth sports and gymnastics, it was reasonably foreseeable that Defendant Nassar, who had prior allegations against him, had and/or would sexually abuse young females, including Plaintiffs, unless properly supervised.

411.   The MSU Defendants by and through their employees, agents, representatives, managers, and/or assigns, such as Kathie Klages, President Simon, President McPherson, Dean Strampel, or Dr. Kovan, knew or reasonably should have known of Defendant Nassar's conduct and/or that Defendant Nassar was an unfit employee, agent, and/or representative because of his sexual interest in children.

412.   The MSU Defendants breached their duty to provide reasonable supervision of Defendant Nassar, and permitted Defendant Nassar, who was in a position of trust and authority, to commit acts against Plaintiffs.

413.   The aforementioned sexual assault, abuse, and molestation occurred while Plaintiffs and Defendant Nassar were on the premises of Defendant MSU and while Defendant Nassar was in the course of his employment, agency, and/or representation with the MSU Defendants.

414.   The MSU Defendants tolerated, authorized, and/or permitted a custom, policy, practice, or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, resulting in the allowance of Defendant Nassar to

-85-

violate the rights of persons such as Plaintiffs with impunity.

415.    The MSU Defendants failed to warn or advise current and former patients of Defendant Nassar, including Plaintiffs, that allegations could surface that in fact the treatments that the patients received was not medical treatment at all but was potentially sexual assault.

416.    The MSU Defendants failed to offer counseling services to current of former patients of Defendant Nassar, including Plaintiffs.

417.    As a direct and proximate result of the MSU Defendants' failure to adequately supervise, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earning and loss of earning capacity.

418.    In the alternative, the MSU Defendants' failure to supervise was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing

-86-

Plaintiffs' daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity.

## COUNT XI
### NEGLIGENT FAILURE TO WARN OR PROTECT
### (Against the MSU Defendants)

419.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

420.    The MSU Defendants knew or should have known that Defendant Nassar posed a risk of harm to Plaintiffs and/or others in Plaintiffs' situation.

421.    The MSU Defendants knew or should have known that Defendant Nassar committed sexual assault, abuse, and molestation and/or was continuing to engage in such conduct.

422.    As early as 1997 and/or 1998, the MSU Defendants had direct and/or constructive knowledge of Defendant Nassar's dangerous conduct and failed to respond reasonably and responsibly.

423.    The MSU Defendants had a duty to warn or protect Plaintiffs and others in Plaintiffs' situation against the risk of injury by Defendant Nassar.

424.    The special, trusting, confidential, and fiduciary relationship between the MSU Defendants and Defendant Nassar, as an employee, agent, and/or representative of the MSU Defendants, created a duty for the MSU Defendants to disclose information regarding Defendant Nassar's sexual conduct.

425.    The MSU Defendants breached the duty owed to Plaintiffs by failing to warn Plaintiffs and/or by failing to take reasonable steps to protect Plaintiffs from Defendant Nassar.

426. The MSU Defendants breached the duties to protect owed to Plaintiffs by failing to:

      a.    Respond to allegations of sexual assault, abuse, and molestation;

      b.    Detect and/or uncover evidence of sexual assault, abuse, and molestation; and

      c.    Investigate, adjudicate, and terminate Defendant Nassar's employment with Defendant MSU prior to 2016.

427. The MSU Defendants violated Plaintiffs' rights by failing to adequately screen, counsel, and/or discipline Defendant Nassar for physical and/or mental conditions that might have rendered him unfit to discharge the duties and responsibilities of a physician at an educational institution, resulting in a violation of Plaintiffs' rights.

428. The MSU Defendants willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiffs from Defendant Nassar's conduct.

429. As a direct and proximate result of the MSU Defendants' failure to warn or protect, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

430. In the alternative, the MSU Defendants' failure to warn or protect was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continues to suffer pain and suffering, pain of mind

and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity.

### COUNT XII
### NEGLIGENT FAILURE TO TRAIN OR EDUCATE
### (Against the MSU Defendants)

431. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

432. The MSU Defendants had a duty to take reasonable protective measures to protect Plaintiffs and others in Plaintiffs' situation against the risk of injury by Defendant Nassar, including the duty to train or educate Plaintiffs and other individuals in Plaintiffs' situation, about how to avoid a risk of sexual assault and/or sexual abuse by Defendant Nassar.

433. The MSU Defendants breached the duty owed to Plaintiffs to take reasonable protective measures to protect Plaintiffs, and other patients of Defendant Nassar, by failing to properly train or educate Plaintiffs and other individuals in Plaintiffs situation, about how to avoid a risk of sexual assault and/or sexual abuse by Defendant Nassar.

434. The MSU Defendants had a duty to train and educate Defendant Nassar in a reasonable manner in regards to Defendant Nassar's treatment of females in his capacity as an employee, agent, and/or representative of the MSU Defendants.

435.     The MSU Defendants breached the duty owed to Plaintiffs by failing to properly train or educate Defendant Nassar in a reasonable manner in regards to Defendant Nassar's treatment of females in his capacity as an employee, agent, and/or representative of the MSU Defendants.

436.     The MSU Defendants failed to implement reasonable safeguards to:

a.     Prevent acts of sexual assault, abuse, and molestation by Defendant Nassar; and,

b.     Avoid placing Defendant Nassar in positions where he would have unsupervised contact and interaction with Plaintiffs and other young women.

437.     As a direct and proximate result of the MSU Defendants' failure to train or educate, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

438.     In the alternative, the MSU Defendants' failure to train or educate was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continues to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including

anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity.

**COUNT XIII**
**NEGLIGENT RETENTION**
**(Against the MSU Defendants)**

439.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

440.     The MSU Defendants owed a duty to Plaintiffs and others in Plaintiffs' situation when credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising employees, agents, and/or representatives to exercise ordinary care.

441.     The MSU Defendants breached the duties owed to Plaintiffs by failing to adequately investigate, report, and address complaints about Defendant Nassar's conduct, which the MSU Defendants knew or should have known.

442.     The MSU Defendants breached the duties owed to Plaintiffs when the MSU Defendants retained Defendant Nassar as an employee, agent, and/or representative after the MSU Defendants discovered or should have reasonably discovered Defendant Nassar's conduct, which reflected a propensity for sexual misconduct.

443.     The MSU Defendants' failure to act in accordance with the standard of care resulted in Defendant Nassar gaining access to and sexually assaulting and/or sexually abusing Plaintiffs and an unknown number of other individuals.

444.     The aforementioned conduct of the MSU Defendants in credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising of Defendant Nassar

created a foreseeable risk of harm to Plaintiffs and other minors and young adults.

445.    As a direct and proximate result of the MSU Defendants' actions in retaining Defendant Nassar, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earning and loss of earning capacity.

446.    In the alternative, the MSU Defendants' actions in retaining Defendant Nassar were so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs and constitutes gross negligence that is the proximate cause of Plaintiffs' damages. Plaintiffs have suffered and continues to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and earning capacity.

### COUNT XIV
### FRAUD AND MISREPRESENTATION
### (Against the MSU Defendants)

447.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

448.   From approximately 1996 to September 2016, the MSU Defendants represented to Plaintiffs and the public that Defendant Nassar was a competent, safe, and highly regarded physician, including but not limited to the following statements made at the MSU Sports Medicine Clinic, Jenison Fieldhouse, and other MSU facilities:

a.   MSU, through the staff at the MSU Sports Medicine Clinic, Dr. Kovens, Dr. Lemmon, and Defendant Nassar's other colleagues, stated that Defendant Nassar was a renowned and competent team physician and athletic physician at MSU, a US National Team Physician, and a US Olympic Team Physician, and repeatedly stated that he was safe, trustworthy, of high moral and ethical repute, and that Plaintiff and the public need not worry about being harmed by Defendant Nassar;

b.   Defendant Klages regularly referred MSU student athletes and other young athletes to Defendant Nassar for treatment, indicating that Defendant Nassar was safe, trustworthy, and of high moral and ethical repute;

c.   Defendant Teachnor-Hauk regularly referred MSU student athletes and other young athletes to Defendant Nassar for treatment, indicating that Defendant Nassar was safe, trustworthy, and of high moral and ethical repute;

d.   MSU represented, through statements in employee Kristine Moore's investigation report issued on or about July 18, 2014, that Defendant Nassar's "treatments" were valid medical procedures, that other competent and disinterested doctors with full knowledge of the facts and circumstances of Amanda Thomashow's complaint ratified Defendant Nassar's treatment of her, and that there was no evidence that Defendant Nassar had sexually abused, assaulted, or molested his patients;

e.   MSU represented, through its athletic trainers and its track and cross country assistant coach Kelli Bert, that Defendant Nassar's treatments were medically appropriate and not sexual abuse, assault, or molestation in 1999 when she dismissed Christine Achenbach's concerns about her treatment and stated that Defendant Nassar was "an Olympic doctor" and "knew what he was doing";

f.   MSU represented, through its softball athletic trainers, including Defendant Teachnor-Hauk and Lianna Hadden, that Defendant Nassar's treatments were medically appropriate and not sexual abuse,

assault, or molestation in 1999 and 2000 in response to Tiffany Lopez's concerns about her treatment by stating that "this is what he was supposed to be doing and this was going to help [Lopez] to play pain free," that Nassar "was a world-renowned doctor who treated elite athletes," and that Lopez should not file a complaint or report;

g.  MSU represented, through an athletic trainer, who witnessed a vicimt's sexual assault during an appointment with Defendant Nassar, that Defendant Nassar's treatments were medically appropriate and not sexual abuse, assault, or molestation in 2014 by stating that "everything was fine" in response to her questions regarding her "treatment";

h.  Defendant Klages represented that Defendant Nassar's treatments were medically appropriate and not sexual abuse, assault, or molestation in or around 1997 or 1998 in response to Larissa Boyce's concerns about her treatment by stating that Defendant Nassar was not "doing anything questionable" and Lopez must be "misunderstanding," discouraging Boyce from reporting the abuse to authorities or her parents, and threatening that a report would "have serious consequences" for Boyce and Nassar;

i.  Defendant Klages represented that Defendant Nassar's treatments were medically appropriate and not sexual abuse, assault, or molestation in or around 1997 or 1998 in response to Jane B8 Doe's confirmation that she had also been assaulted and abused by stating that there was no reason to bring it up or otherwise report Nassar's conduct;

j.  Defendant Klages represented that Defendant Nassar's treatments were medically appropriate and not sexual abuse, assault, or molestation in 2016 by stating in response to a complaint by Lindsey Lemke that Defendant Nassar's procedures were legitimate and encouraging gymnasts to sign a sympathy card for Nassar;

k.  Defendant Klages represented that Defendant Nassar's treatments were medically appropriate and not sexual abuse, assault, or molestation by stating to the mother of a girl who had been assaulted by Defendant Nassar that her account of the abuse "could not have happened."

l.  Other misrepresentations to be revealed in the course of discovery by all MSU Defendants.

449.  By representing that Defendant Nassar was a team physician and an athletic

physician at Defendant MSU and a National Team Physician with Defendant USAG, the MSU Defendants represented to Plaintiffs and the public that Defendant Nassar was safe, trustworthy, and of high moral and ethical repute and that Plaintiffs and the public need not worry about being harmed by Defendant Nassar.

450.    The aforementioned representations were false when they were made because Defendant Nassar had and was continuing to sexually assault, abuse, and molest an unknown number of patients, including Plaintiffs, and other individuals.

451.    The MSU Defendants knew the aforementioned representations regarding Defendant Nassar were false as plaintiffs Larissa Boyce, Jane B8 Doe, Christie Achenbach, Tiffany Thomas Lopez, Jennifer Rood Bedford, Kyle Stephens, and plaintiff Jane D1 Doe's complained of Defendant Nassar's conduct to the MSU Defendants regarding sexual assault, abuse, and molestation in or around 1997/1998, 1999, 2000, 2002-2002, 2004, and/or 2014.

452.    Although Defendant MSU had been informed of Defendant Nassar's conduct, the MSU Defendants failed to investigate, remedy, or in any way address the 1997/1998, 1999, 2000, 2001/2002, 2004, and 2014 complaints against Defendant Nassar.

453.    Alternatively, the MSU Defendants made the misrepresentations described above recklessly without any knowledge of their truth as a positive assertion because of their failure to properly investigate or address any of the abuse complaints or properly evaluate the techniques used by Defendant Nassar.

454.    Despite their knowledge that the representations were false and/or recklessly made, the MSU Defendants continued to hold Defendant Nassar out as a competent and safe physician, intentionally and/or negligently misrepresenting that his

"treatments" were valid medical procedures.

455.   The MSU Defendants had a fiduciary relationship arising out of the doctor-patient relationship that existed between Plaintiffs and MSU through its medical care and treatment of Plaintiffs which imposed upon the MSU Defendants a duty to disclose information regarding Defendant Nassar's repeated abuse and molestation.

456.   The MSU Defendants intended that the Plaintiffs should act on their misrepresentations, including by continuing to seek treatment from Defendant Nassar and by not reporting their sexual abuse, assault, and molestation to law enforcement, their parents, or others.

457.   The misrepresentations described above were material, as they induced the Plaintiffs to seek treatment from Defendant Nassar and not to report their sexual abuse, assault, and molestation to law enforcement, their parents, or others.

458.   Plaintiffs reasonably relied on the MSU Defendants' misrepresentations by continuing to seek "treatment" by Defendant Nassar and choosing not to report their sexual abuse, assault, and molestation to law enforcement, their parents, or others.

459.   The MSU Defendants suppressed material facts that they had a good faith duty to disclose regarding Defendant Nassar's sexual abuse, assault, and molestation, the complaints against Defendant Nassar, and the invalidity of his purported medical treatments.

460.   The MSU Defendants benefitted from their representation that Defendant Nassar was a competent and safe physician financially and in terms of reputation as girls and young women continued to seek out treatment from Defendant Nassar.

461.   As a result of the MSU Defendants' fraudulent misrepresentations, Defendant

Nassar was permitted to continue his employment at MSU and sexually abuse, assault, and molest Plaintiffs.

462.    The actions of the MSU Defendants described above constitute intentional fraudulent misrepresentation, fraud by nondisclosure, and fraudulent concealment

463.    Defendant Nassar was permitted to continue employment and sexually assault, abuse, and molest an unknown number of other individuals, despite Plaintiff Amanda Thomashow's 2014 complaint against Defendant Nassar to Kristine M. Moore, Assistant Director for Institutional Equity at the MSU Office for Inclusion and Intercultural Initiatives.

464.    The MSU Defendants disregarded Plaintiff Amanda Thomashow's 2014 complaint because of Defendant MSU's culture which included existence of a sexually hostile environment on Defendant MSU's campus and premises and the University's failure to address complaints of sexual harassment, including sexual violence in a prompt and equitable manner which in turn caused and may have contributed to a continuation of the sexually hostile environment, Defendant Nassar was permitted to continue employment and sexually abuse, assault, and molest Plaintiffs and an unknown number of other individuals.

465.    The MSU Defendants intentionally withheld material opinions, findings, evidence, and conclusions from Plaintiff Amanda Thomashow and other Plaintiffs in regard to the findings of Plaintiff Amanda Thomashow's Title IX investigation conducted in 2014, as described herein this Complaint.

466.    Between the time of Plaintiff Amanda Thomashow's 2014 complaint and 2016, the MSU Defendants continued to portray Defendant Nassar as a safe and competent

physician.

467.    The MSU Defendants, by and through their representatives, also affirmatively took steps to attempt to dissuade Plaintiff Amanda Thomashow from speaking with police about her complaints against Defendant Nassar.

468.    The MSU Defendants, by and through their representatives, also affirmatively took steps to attempt to dissuade other potential victims of Defendant Nassar from speaking with police or the media by advising the potential victims to respond "No comment" to any requests by media or police.

469.    These actions of MSU Defendants, including the disregard of Plaintiff Amanda Thomashow's complaints, were purportedly done as an attempt to hide the known instances of sexual abuse committed by Defendant Nassar.

470.    As a result of Plaintiffs' and the public's reliance on the MSU Defendants' fraudulent misrepresentations regarding Defendant Nassar, Plaintiffs and others in Plaintiffs' situation were sexually assaulted, abused, and molested by Defendant Nassar during appointments.

471.    As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiff has suffered and continues to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depression, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff has been prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life, and have sustained and continues to

sustain a loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

**COUNT XXX**
**MICHIGAN CHILD PROTECTION LAW - FAILURE TO REPORT CHILD ABUSE**
**(Against Defendants Klages, Strampel, Kovan, and Stollak)**

472.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

473.    Michigan's Child Protection Law, MCL 722.621 et seq., establishes mandatory reporting guidelines for suspected child abuse or neglect and provides penalties for failure to report child abuse or neglect.

474.    Specifically, MCL 722.623 provides in pertinent part:

> A physician, dentist, physician's assistant, registered dental hygienist, medical examiner, nurse, person licensed to provide emergency medical care, audiologist, psychologist, marriage and family therapist, licensed professional counselor, social worker, licensed master's social worker, licensed bachelor's social worker, registered social service technician, social service technician, a person employed in a professional capacity in any office of the friend of the court, school administrator, school counselor or teacher, law enforcement officer, member of the clergy, or regulated child care provider who has reasonable cause to suspect child abuse or child neglect shall make an immediate report to centralized intake by telephone, or, if available, through the online reporting system, of the suspected child abuse or child neglect.

MCL 722.623. [Emphasis added.]

475.    The MSU Individual Defendants who were physicians, psychologists, and school teachers who were mandatory reporters.

476.    Child abuse is defined as "harm or threatened harm to a child's health or

welfare that occurs through nonaccidental physical or mental injury, sexual abuse, sexual exploitation, or maltreatment, by a parent, a legal guardian, or any other person responsible for the child's health or welfare or by a teacher, a teacher's aide, or a member of the clergy." MCL 722.622(g).

477.    Nassar was responsible for the health or welfare of plaintiffs and as such, were obligated to report the abuse by Nassar.

478.    Nassar was a non-parent adult who had substantial and regular contact with one or more of the plaintiffs, as well as a close personal relationship with the parents and/or guardians of one or more of the plaintiffs.

479.    Child neglect is defined as "harm or threatened harm to a child's health or welfare by a by a parent, a legal guardian, or any other person responsible for the child's health or welfare that occurs through either of the following: (i) Negligent treatment, including the failure to provide adequate food, clothing, shelter, or medical care. (ii) Placing a child at an unreasonable risk to the child's health or welfare by failure of the parent, legal guardian, or any other person responsible for the child's health or welfare to intervene to eliminate that risk when that person is able to do so and has, or should have, knowledge of the risk." MCL 722.622(k).

480.    Upon information and belief, reports of abuse were made to one or more the MSU Individual Defendants by victim(s) while the victim(s) was a minor.

481.    Upon information and belief, one or more of the MSU Individual Defendants failed to report suspected abuse of individuals who were minors.

482.    Upon information and belief, one or more of the MSU Individual Defendants had contact with a minor victim(s) and knew that the minor victim(s) was a patient of

Nassar.

483.     Upon information and belief, one or more of the MSU Individual Defendants were on notice that Nassar was abusing minors.

484.     Under MCL 722.633(1), "A person who is required by this act to report an instance of suspected child abuse or neglect and who fails to do so is civilly liable for the damages proximately caused by the failure."

485.     Defendants Klages, Strampel, Kovan, and Stollak were mandatory reporters during the time Defendant Nassar was engaged in child abuse or child neglect.

486.     As established in the allegations above, Defendants Klages, Strampel, Kovan, and Stollak had reasonable cause to suspect child abuse or child neglect.

487.     Defendant Klages, Strampel, Kovan, and Stollak failed to report any instances of suspected child abuse or neglect.

488.     Defendants Klages, Strampel, Kovan, and Stollak are or were employed by Defendants Michigan State University and Michigan State University Board of Trustees during the time Defendant Nassar was engaged in child abuse or child neglect, and were acting in the scope and course of their employment when they failed to report any instances of suspected child abuse or neglect.

489.     Defendants Klages, Strampel, Kovan, and Stollak are directly civilly liable for the damages proximately caused by their failure to report any instances of suspected child abuse or neglect. Defendants Michigan State University and Michigan State University Board of Trustees are vicariously liable for said damages.

490.     As a direct and proximate result of Defendants' failure to report any instances of suspected child abuse or neglect, Plaintiffs have suffered and continue to suffer

pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

**COUNT XXXI**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Against all Defendants)**

491.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

492.    The MSU Defendants tolerated or permitted their employee or agent to sexually assault, abuse, and molest children and young adults after they knew or should have known of complaints and claims of sexual assault and abuse occurring during Defendant Nassar's "treatments."

493.    The MSU Defendants held Defendant Nassar in high esteem and acclaim which in turn encouraged Plaintiff and others to respect and trust Defendant Nassar and seek out his services and to not question his methods or motives.

494.    The MSU Defendants abused their positions to protect Defendant Nassar in part to bolster and sustain his national and international reputation in the gymnastics community and bolster and sustain Defendant MSU's national reputation.

495.    The MSU Defendants threatened, misled, and otherwise discouraged women and girls from reporting sexual assault by its employee, Defendant Nassar, to the appropriate persons at MSU or to law enforcement.

496.    By routinely ignoring, disregarding, and failing to investigate evidence of

sexual assault by Defendant Nassar, the MSU Defendants created a culture and environment in which sexual abuse victims understood that their complaints would be met with disbelief and indifference, and thus victims understood that the university would not take any measures reasonably calculated to end the abuse.

497.   The MSU Defendants chose not to adequately train and supervise Defendant Nassar and/or prevent Defendant Nassar from committing acts of sexual assault, abuse, and molestation.

498.   In 2014, the MSU Defendants performed a deficient and biased investigation into Defendant Nassar's conduct and allowed Defendant Nassar to return to seeing patients prior to the completion of that investigation. The MSU Defendants performed no investigation into the complaints raised prior to 2014.

499.   The MSU Defendants' conduct as described above has been condemned as outrageous and intolerable in modern society by government, industry, and independent investigators, resulting in public censures and fines stemming from their failures to appropriately address complaints of sexual assault by Defendant Nassar, including but not limited to a $4.5 million fine by the United States Department of Education and an unsolicited admonishment of Kristine Moore's deficient 2014 investigation by the Michigan Attorney Grievance Commission.

500.   The MSU Defendants' conduct as described above has been consistently condemned as outrageous and intolerable in modern society by members of Congress, members of the media, MSU faculty groups, students, and alumni, and other members of the public.

501.   The MSU Defendants' conduct as described above was intentional and/or

reckless.

502.    The MSU Defendants' conduct as described above was extreme, outrageous, and of such character as not to be tolerated by a civilized society.

503.    Any reasonable person would know that emotional distress would result from the MSU Defendants' reckless conduct described above.

504.    As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiff has suffered and continues to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiff has been prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain a loss of earnings and earning capacity; and has required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions

## COUNT XXXII
## VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT – MCL 37.2101 *ET SEQ.*
## (Against MSU Individual Defendants)

### *Discrimination in the Provision of Educational Programs*
### *(against MSU Individual Defendants)*

505.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

506.    MSU is an educational institution.

507.    The MSU Individual Defendants are all "persons" under ELCRA.

508.    Plaintiffs are all individuals protected by ELCRA because of their utilization of or benefit from the services, activities, and programs provided by MSU.

509.    ELRCA prohibits discrimination "against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provide by the institution because of" *inter alia* sex. M.C.L. § 37.2402(a).

510.    ELCRA prohibits two or more persons from conspiring to "[a]id, abet, incite, compel, or coerce a person to engage in a violation" of the act, including discriminating against an individual utilizing services provided by an educational institution. M.C.L. § 37.2701(b).

511.    ELCRA prohibits an individual from acting to "[a]id, abet, incite, compel, or coerce a person to engage in a violation" of the act, including discriminating against an individual utilizing services provided by an educational institution. M.C.L. § 37.2701(b).

512.    ELCRA prohibits two or more persons from conspiring to "[a]ttempt directly or indirectly to commit an act prohibited by the act," including discriminating against an individual utilizing services provided by an educational institution. M.C.L. § 37.2701(c).

513.    ELCRA prohibits an individual from acting to ""[a]ttempt directly or indirectly to commit an act prohibited by the act," including discriminating against an individual utilizing services provided by an educational institution. M.C.L. § 37.2701(c).

514.    Sex discrimination prohibited by ELCRA includes unwelcome sexual conduct, sexual assault and other forms of unwelcome physical sexual contact which has the effect of substantially interfering with an individual's utilization of services or benefits provided by an educational institution or creating an intimidating, hostile or offensive environment.

MCL 37.2103(i) (iii).

515.   As alleged in detail above, Nassar perpetrated acts of sexual assault, unwelcome physical sexual contact, and unwelcome and nonconsensual sexual conduct, on Plaintiffs.

516.   Nassar committed these acts of sexual assault, unwelcomed sexual contact, and unwelcomed and nonconsensual sexual conduct as an employee of MSU and while providing services as a clinician treating Plaintiffs, who were patients of MSU's medical facilities and/or students and athletes participating in MSU's educational programs.

517.   The MSU Individual Defendants knew or should have known that Nassar was committing acts of sexual assault, unwelcomed sexual contact, and unwelcomed and nonconsensual sexual conduct on his patients and the students and athletes being treated by him.

518.   Despite their knowledge of Nassar's pervasive sexual assaults and unwelcome sexual contact on patients and students utilizing the services, programs and activities of MSU, Defendants failed to promptly and appropriately investigate, respond to, and remedy the sexual assaults after they received repeated notice of Nassar's wrongdoing which subjected Plaintiffs and countless others to further sexual harassment and sexual assaults as well as a sexually hostile environment.

    a.   The MSU Individual Defendants conspired and/or acted to aid and/or, abet Nassar's acts of sexual assault, unwelcomed sexual contact, and unwelcomed and nonconsensual sexual conduct in ways alleged above, not limited to: Failing to investigate complaints they received regarding his unlawful acts against his patients;

    b.   Informing Plaintiffs and their parents and guardians in person that Nassar was a world-renowned physician whose techniques were

above reproach, even though they knew that he sexually assaulted his patients;

c.     Publishing online and in written materials Nassar's affiliation with MSU and his world renown as a physician, even though they knew that he sexually assaulted his patients;

d.     Failing to discipline or fire Nassar when they first learned of his unlawful conduct, which allowed him to continue treating patients, including Plaintiffs, and continue his acts of sexual assault; and

e.     Actively encouraging and referring Plaintiffs—their students, athletes, and patients—to seek Nassar's treatment, knowing that they were subjecting Plaintiffs to Nassar's sexual assaults.

519.     As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered, among other things, humiliation, degradation, intimidation, confusion and emotional distress.

### *Denial of Public Accommodations and Services* 
### *(against MSU Individual Defendants)*

520.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

521.     ELCRA defines a "place of public accommodation" as "a business, or an educational , refreshment, entertainment, recreation, health, or transportation facility, or institution of any kind, whether licensed or not, whose services, facilities, privileges, advantages, or accommodations are extended, offered, sold or otherwise available to the public." This definition specifically includes sports and athletic clubs. M.C.L. § 37.2301(a).

522.     ELCRA defines a "public service" as "a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof or a tax-exempt private agency established to provide service to the public." M.C.L. § 37.2301(b).

523.    MSU is both a "place of public accommodation" and a "public service" as defined by ELCRA.

524.    All individual and institutional Defendants are "persons" under ELCRA.

525.    ELCRA prohibits a person from "deny[ing] an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of" *inter alia* sex.

526.    Sex discrimination prohibited by ELCRA includes unwelcome sexual conduct, sexual assault and other forms of unwelcome physical sexual contact which has the effect of substantially interfering with an individual's utilization of services or benefits provided by an educational institution or creating an intimidating, hostile or offensive environment. MCL 37.2103(i) (iii).

527.    As alleged in detail above, Nassar perpetrated acts of sexual assault, unwelcome physical sexual contact, and unwelcome and nonconsensual sexual conduct, on Plaintiffs.

528.    Nassar committed these acts of sexual assault, unwelcomed sexual contact, and unwelcomed and nonconsensual sexual conduct as an employee of MSU and while providing services as a clinician treating Plaintiffs, who were patients of MSU's medical facilities and/or students and athletes participating in MSU's educational programs.

529.    Defendants and their employees, agents and representatives knew or should have known that Nassar was committing acts of sexual assault, unwelcomed sexual contact, and unwelcomed and nonconsensual sexual conduct on his patients and the students and athletes being treated by him as a result of the myriad complaints as well as the pervasiveness of Nassar's sexual assaults and unwelcome contact.

530.    Despite knowledge of Nassar's pervasive sexual assaults and unwelcome sexual contact on patients and students, Defendants failed to promptly and appropriately investigate, respond to, and remedy the sexual assaults after they received repeated notice of Nassar's wrongdoing which subjected Plaintiffs and countless others to further sexual harassment and sexual assaults as well as a sexually hostile environment.

531.    Defendants and their employees, agents and representatives denied and/or substantially interfered with Plaintiffs' access to training and treatments that were free of sexual assault, unwelcomed sexual contact, and unwelcomed and nonconsensual sexual conduct and created a sexually hostile, offensive and intimidating environment for Plaintiffs in ways alleged above, not limited to:

>    a.    Failing to investigate complaints they received regarding his unlawful acts against his patients;
>
>    b.    Informing Plaintiffs and their parents and guardians in person that Nassar was a world-renowned physician whose techniques were above reproach, even though they knew that he sexually assaulted his patients;
>
>    c.    Publishing online and in written materials Nassar's affiliation with their institutions and his world renown as a physician, even though they knew that he sexually assaulted his patients;
>
>    d.    Failing to discipline or fire Nassar when they first learned of his unlawful conduct, which allowed him to continue treating patients, including Plaintiffs, and continue his acts of sexual assault; and
>
>    e.    Actively encouraging and referring Plaintiffs—their students, athletes, and patients—to seek Nassar's treatment, knowing that they were subjecting Plaintiffs to Nassar's sexual assaults.

532.    The Defendants conspired and/or acted to aid and/or abet Nassar's acts of sexual assault, unwelcomed sexual contact, and unwelcomed and nonconsensual sexual conduct in ways alleged above, not limited to:

a. Failing to investigate complaints they received regarding his unlawful acts against his patients;

b. Informing Plaintiffs and their parents and guardians in person that Nassar was a world-renowned physician whose techniques were above reproach, even though they knew that he sexually assaulted his patients;

c. Publishing online and in written materials Nassar's affiliation with MSU and his world renown as a physician, even though they knew that he sexually assaulted his patients;

d. Failing to discipline or fire Nassar when they first learned of his unlawful conduct, which allowed him to continue treating patients, including Plaintiffs, and continue his acts of sexual assault; and

e. Actively encouraging and referring Plaintiffs—their students, athletes, and patients—to seek Nassar's treatment, knowing that they were subjecting Plaintiffs to Nassar's sexual assaults.

533.  As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered, among other things, humiliation, degradation, intimidation, confusion and emotional distress

## Count XXXIII
## ASSAULT AND BATTERY
## (Against Defendant Nassar)

534.  Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

535.  The acts committed by Defendant Nassar against Plaintiffs described herein constitute assault and battery, actionable under the laws of Michigan.

536.  Defendant Nassar committed nonconsensual sexual acts, which resulted in harmful or offensive contact with the body of Plaintiffs.

537.  Specifically, Defendant Nassar committed acts which caused injury to Plaintiffs by subjecting them to an imminent battery and/or intentional invasion of their

-110-

right to be free from offensive and harmful contact, and said conduct demonstrated that Defendant had a present ability to subject Plaintiffs to an immediate intentional offensive and harmful touching.

538.    Defendant Nassar assaulted and battered Plaintiffs by nonconsensual and unwanted digital vaginal penetration, digital anal penetration, or touching of Plaintiffs' breasts without notice or explanation of the "treatment."

539.    Plaintiffs did not consent to the contact, which caused injury, damage, loss, and/or harm.

540.    As a direct and proximate result of Defendants' assault and battery, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earnings and loss of earning capacity.

## LEGAL DUTY

541.    Each allegation in the above paragraphs is hereby expressly incorporated as though fully stated herein.

542.    MSU and the Individual MSU defendants owed plaintiff a duty to use due care to ensure her safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents, including defendant Nassar.

543.    Defendant Nassar owed plaintiff a duty of due care in carrying out medical

treatment as an employee, agents, and/or representative of the MSU defendants.

544.   By seeking medical treatment from defendant Nassar in the course of his employment, agency, and/or representation of the MSU defendants, a special, confidential, and fiduciary relationship between both the plaintiff and Defendant Nassar was created, resulting in Defendant Nassar owing plaintiff a duty to use due care.

545.   A special relationship also existed between defendant Nassar and MSU, through his employment relationship. This special relationship extended towards his authorized and high-profile work with Twistars and USAG, which brought about referrals and an influx of gymnastics clients towards MSU's medical facilities.

546.   MSU and the Individual MSU defendants failed to adequately train and supervise defendant Nassar, especially after MSU knew or should have known of complaints regarding his nonconsensual sexual touching and assaults during "treatment."

547.   Defendant MSU's internal policies assume and impose certain duties, including that "[a]ll University employees . . . are expected to promptly report sexual misconduct or relationship violence that they observe or learn about and that involves a member of the University community or occurred at a University event or on University property." They state further: "[t]he employee must report all relevant details about the alleged relationship violence of sexual misconduct that occurred on campus or at a campus-sponsored event…"

548.   Defendant MSU's aforementioned internal policies were violated when the MSU Defendants took no action to address the repeated complaints regarding Defendant Nassar's conduct.

549.   That Defendant MSU and the Individual MSU Defendants had numerous legal

duties that were owed to the plaintiff, along with the many other victims of sexual abuse by

Defendant Nassar. Those legal duties include, but are not limited to, the following:

   a.   Premises liability duties for all sexual assaults which occurred on University grounds, or at University functions that were controlled by the University;

   b.   The duty to make reasonable efforts to expedite police involvement in relation to the University's knowledge that Dr. Nassar posed a known threat to commit foreseeable criminal acts against third parties like the plaintiff;

   c.   Duties assumed under the doctrine of *in loco parentis*;

   d.   Special and fiduciary duties from the nature of the doctor-patient relationship;

   e.   Duties assumed under Defendant MSU's own policies and procedures in relation to reporting and addressing sexual misconduct;

   f.   Duties imposed by common law claims for negligent retention, given MSU's open knowledge in a situation where it knew or should have known about its employee's propensities to engage in sexual assault and molestation of his many victims;

   g.   Duties imposed under social host liability, to the extent any of Defendant Nassar's victims were licensee at events.

550.   For nearly two decades, MSU and the Individual Defendants routinely and repeatedly breached their duties owed to Defendant Nassar's many victims, including the plaintiff.

551.   MSU knew or should have known of the foreseeability of sexual abuse to Defendant Nassar's many patients, including the plaintiff. By failing to properly investigate, address, warn, and remedy the many complaints regarding Defendant Nassar's repeated sexual abuse of young women including the plaintiff, MSU and the Individual MSU

Defendants breached the legal and assumed duties imposed upon them by the common law.

552. Defendant Nassar's conduct in sexually assaulting, abusing, and molesting plaintiff in the course of his employment, agency, and/or representation of the MSU defendants was a breach of his duty to use ordinary care and to conduct.

553. As a direct result of the breach of duty by Defendant MSU and the Individual MSU Defendants, plaintiff has suffered and continues to suffer pain of main and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, depression, disgrace, fright, grief, humiliation, and loss of enjoyment of life.

### DAMAGES - FOR ALL AFOREMENTIONED CAUSES OF ACTION

554. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

555. As a direct and/or proximate result of Defendants' actions and/or inactions stated above, Plaintiffs have suffered and continue to suffer pain of mind and body, mental anguish, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, enjoyment of life, was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and continues to sustain loss of earning and loss of earning capacity.

556. The conduct, actions and/or inactions of Defendants as alleged in the above stated counts and causes of action constitute violations of Plaintiffs' constitutional and federal rights as well as the common and/or statutory laws of the State of Michigan, and the

-114-

United States District Court has jurisdiction to hear and adjudicate said claims.

557. In whole or in part, as a result of some or all of the above actions and/or inactions of Defendants, Plaintiffs have and continue to suffer irreparable harm as a result of the violations.

558. The amount in controversy exceeds the jurisdictional minimum of $75,000.00.

WHEREFORE, Plaintiffs request this Court and the finder of fact to enter a Judgment in Plaintiffs' favor against all named Defendants on all counts and claims as indicated above in an amount consistent with the proofs of trial, and seek against Defendants all appropriate damages arising out of law, equity, and fact for each or all of the above counts where applicable and hereby request that the trier of fact, be it judge or jury, award Plaintiffs all applicable damages, including but not limited to compensatory, special, exemplary, punitive, and/or treble damages, in whatever amount the Plaintiffs are entitled, and all other relief arising out of law, equity, and fact, also including but not limited to:

      a.    Compensatory damages in an amount to be determined as fair and just under the circumstances, by the trier of fact including, but not limited to medical expenses, loss of earnings, mental anguish, anxiety, humiliation, and embarrassment, violation of Plaintiffs' constitutional, federal, and state rights, loss of social pleasure and enjoyment, and other damages to be proved;

      b.    Punitive, treble, and/or exemplary damages in an amount to be determined as reasonable or just by the trier of fact;

      c.    Reasonable attorney fees, interest, and costs; and

      d.    Other declaratory, equitable, and/or injunctive relief, including, but not limited to implementation of institutional reform and measures of accountability to ensure the safety and protection of young athletes and other individuals, as appears to be reasonable and just.

-115-

Respectfully submitted:

OLSMAN MACKENZIE PEACOCK &
WALLACE, P.C.

_____
Donna M. MacKenzie (P62979)
Emily G. Thomas (P76638)
Attorneys for Plaintiffs
2684 West Eleven Mile Rd.
Berkley, MI 48072
(248) 591-2300

Dated: October 4, 2019

## **JURY DEMAND**

NOW COME Plaintiffs, by and through their attorneys, OLSMAN MACKENZIE

PEACOCK & WALLACE, P.C., and hereby demand a jury trial on all claims set forth above.

Respectfully submitted:

OLSMAN MACKENZIE PEACOCK &
WALLACE, P.C.

By: _____
Donna M. MacKenzie (P62979)
Attorneys for Plaintiff
2684 West Eleven Mile Rd.
Berkley, MI 48072
(248) 591-2300
dmackenzie@olsmanlaw.com
ethomas@olsmanlaw.com

Dated: October 4, 2019

-116-